Opinion
BAXTER, J.
On a clear evening in February 2007, defendant Richard Tom broadsided at high speed a vehicle driven by Loraine Wong, who was making a left turn from Santa Clara Avenue onto Woodside Road in Redwood City. Wong’s younger daughter, Sydney Ng, eight, was killed; her older daughter, Kendall Ng, 10, sustained serious injuries. The evidence at trial showed that defendant did not brake prior to the crash. He had been speeding, although his precise speed was disputed. He had been drinking earlier that evening, although (again) the amount he had consumed was disputed.
The issue before us arises from the People’s reliance in their case-in-chief on defendant’s failure to inquire about the occupants of the other vehicle as evidence that he was driving without due regard for their safety. Did it violate the Fifth Amendment privilege against self-incrimination to admit evidence that defendant, following his arrest but before receipt of Miranda[1] warnings, expressed no concern about the well-being of the other people involved in the collision?
*1215 The issue is one of first impression for this court. However, a plurality of the high court recently addressed the “closely related” issue of prearrest silence in Salinas v. Texas (2013) 570 U.S._,_[186 L.Ed.2d 376, 133 S.Ct. 2174, 2182] (plur. opn. of Alito, J.) (Salinas), and we find that analysis instructive. Declaring that “[t]he privilege against self-incrimination ‘is an exception to the general principle that the Government has the right to everyone’s testimony,’ ” the Salinas plurality applied “the ‘general rule’ that a witness must assert the privilege to subsequently benefit from it.” (Id. at pp. _., __ [133 S.Ct. at pp. 2179, 2181] (plur. opn. of Alito, J.).) We likewise apply the general rule here and conclude that defendant, after his arrest but before he had received his Miranda warnings, needed to make a timely and unambiguous assertion of the privilege in order to benefit from it. Because the Court of Appeal held that the Fifth Amendment privilege against self-incrimination categorically prohibited any reference to defendant’s post-arrest failure to inquire about the others involved in the collision without ever considering whether defendant had clearly invoked the privilege, we reverse the judgment of the Court of Appeal and remand for further proceedings.
Background
Defendant was charged with gross vehicular manslaughter while intoxicated, driving under the influence causing harm to another, and driving with a blood-alcohol level of 0.08 percent or higher causing harm to another, along with various enhancement allegations. A jury acquitted defendant of the alcohol-related charges but convicted him of vehicular manslaughter with gross negligence and found true the allegation that he personally inflicted great bodily injury on Kendall Ng. (Pen. Code, § 192, subd. (c)(1); id., former § 12022.7, subd. (a).) The court sentenced defendant to seven years in prison.

Events Surrounding the Fatal Collision

Defendant spent the early evening of February 19, 2007, entertaining his longtime friend Peter Gamino, a retired San Francisco police officer who was visiting from out of state. Defendant cooked a steak dinner at his Redwood City home and, after waking Gamino from a nap around 5:30 or 6:00 p.m., made them vodka tonics. Around 6:30 p.m., Gamino made another round of drinks. He did not know whether defendant finished that drink.
After dinner, defendant announced that they needed to pick up a vehicle from his son’s home just north of Woodside Road. Gamino testified that defendant exhibited no signs of intoxication, but admitted defendant had trouble finding his son’s house: “We didn’t get there right away. Couldn’t find our — the way. We eventually found it.” On the return trip, defendant *1216 drove his Mercedes E320, and Gamino followed 100 to 150 yards behind in the Toyota Camry they had picked up at the son’s house. Gamino was traveling at the speed limit.
As the two cars turned from Alameda de las Pulgas onto Woodside Road, defendant was about 200 yards ahead. Gamino accelerated on Woodside, but defendant remained “a ways ahead.”
Meanwhile, Loraine Wong had left her home on Santa Clara Avenue in Redwood City to drive her daughters to an overnight visit at her sister’s house in Sunnyvale. Her sister, Geneva, had a new baby, and the girls were excited to see their new cousin. They were bringing some books they had purchased at Barnes and Noble that evening.
As they left the house, Wong called Geneva to let her know that they were on their way. Wong had completed the call by the time she reached the intersection of Santa Clara Avenue and Woodside (a two-lane divided state highway) less than a mile away, but the phone was still in her hand. Wong came to a full stop at the stop sign and inched forward, looking both ways. Her lights and blinker were on. She first looked left, and saw it was clear all the way to Alameda de las Pulgas, four-tenths of a mile away. She looked right, where it was also clear. Turning back to the left, she still saw no headlights or vehicles coming and began her turn onto Woodside. Wong, who had lived on Santa Clara Avenue for 15 years, had driven through this intersection several thousand times before.
This time was different. Suddenly, there was a flash of light, a feeling of soreness, and the pressure of the airbag. She had not seen headlights or heard any sound of braking, but Wong realized they had been hit. She looked outside but did not see any cars around her. She looked back and saw her daughters were unconscious and their faces were bleeding. As Wong climbed into the backseat, people nearby came to offer assistance. Wong shouted out her husband’s phone number for someone to call him. Kendall regained consciousness, but Sydney never did. Sydney was pronounced dead at Stanford Hospital at 8:53 p.m. The cause of death was multiple blunt injuries. Kendall suffered a three-inch gash on her forehead, which was closed with 30 to 40 stitches, and a broken arm. She had to use a brace for her injured neck and spent a week in the hospital. Wong suffered internal injuries, a broken rib, and a broken finger. Pieces of broken glass had scratched her face, arms, knees, and feet.
Sergeant Alan Bailey of the Redwood City Police Department received a report of the crash at 8:20 p.m. and arrived at the scene 10 minutes later. Wong’s vehicle, a 1996 Nissan Maxima, was badly damaged. The point of *1217 contact was the left rear quarter panel and passenger door, where there was a “massive intrusion.” The left rear passenger window and the rear windshield were shattered; the front windshield was broken. Defendant’s vehicle, a 2006 Mercedes E320, was considerably north of the intersection, about 200 feet from the Nissan. Bailey testified that it was “incredible to see those vehicles that far apart in an accident that occurred in the city,” where the posted speed limit is 35 miles per hour. The Mercedes had suffered major damage to its front end, a cracked windshield, a broken left-side mirror, and a couple of flat tires. Based on the circumstances at the scene, Bailey concluded that the Nissan had come from Santa Clara Avenue in a westbound direction turning left onto Woodside; the Mercedes had come north on Woodside “[ejxtremely fast,” “[n]ot even close” to the speed limit; and there was a broadside collision.
Officer Janine O’Gorman, who arrived about an hour after Bailey, was assigned to be the lead investigator for this incident. She found no evidence that the Mercedes had applied its brakes prior to impact.[2] Based on the glass fragments, she opined that the Nissan had spun at least 360 degrees following the impact. She testified that although defendant’s view of the intersection would have been partially obstructed by the Dodge Caravan parked on the comer of Woodside and Santa Clara as well as by the Arco sign at the comer gas station, in that those objects would have made it harder to see cars turning left onto Woodside, defendant was driving recklessly and was responsible for the collision.
Officer Jincy Pace, a traffic accident investigator with the San Jose Police Department, agreed that the Mercedes barreled into the left rear portion of the Nissan and spun it around and that the primary cause of the collision was the Mercedes’s unsafe speed. Using a conservatively low “drag factor” (a measurement of the frictional relationship between the tire and the roadway), Pace calculated the Mercedes was traveling at a speed of at least 67 miles per hour prior to the collision; the Nissan was traveling about 12 miles per hour. Pace estimated that the Mercedes would have been at least 334 feet away from the intersection at the time the Nissan began its turn and opined that the Nissan would thus have had the right of way. Pace estimated that the Nissan would have been in the intersection for at least three to four and one-half seconds prior to the collision, which would have given the Mercedes enough time to stop even if it were speeding at 67 miles per hour.
Defendant’s friend Peter Gamino, on the other hand, testified that the Nissan pulled out from Santa Clara Avenue “fairly fast” and “instead of *1218 stopping like [it] should have, [the Nissan] drove right in front of [defendant].” However, Gamino conceded that he did not recall mentioning to officers at the scene that the Nissan drove right in front of defendant.

Defendant’s Postcollision Conduct

Right after the collision, Gamino parked and went over to defendant’s car to see if he was all right. Defendant said, “I didn’t even see it.” Once the paramedics arrived, Gamino returned to the Camry.
Defendant was behind the wheel of the Mercedes when police first arrived. Two paramedics, one in the front seat and one in the back, were attending to defendant. Officer Josh Price had a brief conversation with defendant, but did not detect any odor of alcohol. When defendant’s girlfriend arrived and he got out of the car, he was limping slightly and complained of an ankle injury. The paramedics tried to convince defendant to go to the hospital to be examined, but defendant declined because he was concerned that his insurance would not cover it.
At some point, defendant and his girlfriend walked over and got into Gamino’s Camry. About 15 minutes later, Officer Price walked over to the Camry to talk to Gamino. Defendant interrupted them to ask whether he could walk home, as he lived only half a block away. Price told him “no,” since the investigation “obviously” was ongoing and he was needed at the scene. When defendant said his ankle hurt, he was given an icepack. Despite the recommendation of the paramedics that he seek treatment, defendant signed a form declaring that he had refused to seek treatment “against medical advice.”
Around 9:30 p.m., when Sergeant Bailey discovered that defendant was sitting in the Camry, he ordered defendant be moved to the rear of a patrol vehicle. Defendant’s girlfriend was allowed to join him in the backseat. He was not handcuffed. In accordance with the police department’s general policy to ask for a voluntary blood sample when a major injury collision has occurred (and to obtain a detailed statement from defendant), Sergeant Bailey asked defendant whether he would cooperate. Defendant said he would, although he seemed irritated that his blood could not be drawn at the scene. Defendant and his girlfriend were transported to the police station so that defendant’s blood could be drawn. They arrived at 9:57 p.m. A paramedic was dispatched to the police station around 10:00 p.m., but Redwood City’s contract with American Medical Response did not authorize a blood draw for suspicion of driving under the influence unless the suspect had first been placed under arrest. When Officer Price asked whether defendant would be willing to go to the hospital to get his blood drawn, defendant again seemed *1219 irritated. Defendant asked whether he could refuse and was told it would be in his interest to prove that he had nothing in his system.
Shortly thereafter, around 10:30 p.m., defendant asked to use the bathroom. He was accompanied there by Sergeant Bailey. While in the bathroom, defendant, who was limping, asked for an aspirin. Bailey, who was in “very close proximity” to defendant, for the first time noticed the odor of alcohol on his breath and the bloodshot and glassy appearance of his eyes. Back in the interview room, Officer Price likewise noticed the odor of alcohol on defendant, who had been chewing gum at the crash scene and at the station. Officer Roman Gomez, too, smelled alcohol and noticed that defendant’s eyes were bloodshot and glassy. Officer Price administered three field sobriety tests (the horizontal gaze nystagmus test, the Romberg test, and the finger-to-nose test), concluded that defendant had been under the influence of alcohol at the time of the collision, and arrested him. During his contact with Officer Price and Sergeant Bailey, defendant never asked them about the welfare of the other people involved in the collision.
Defendant’s blood was drawn at 11:13 p.m., around three hours after the crash. The test revealed a blood-alcohol level of 0.04 percent. Using a burnoff rate of 0.02 percent of alcohol per hour (which is a rate widely accepted in the scientific community) and taking account of the steak dinner consumed by defendant as well as the other circumstances, criminalist Carlos Jose Jirón opined that defendant must have consumed six drinks and that his blood-alcohol level at the time of the crash was 0.098 percent. In Jirón’s opinion, defendant would have been too impaired to drive safely.

Police Interview of Peter Gamino

Sergeant Paul Sheffield went to defendant’s house around 11:30 p.m. to speak with defendant’s houseguest, Peter Gamino. The interview was taped and played for the jury. Sergeant Sheffield noticed a large bottle of vodka, “much bigger than a fifth,” in the kitchen. The bottle was two-thirds empty. Gamino, who was awakened by the police visit, seemed to have “had a drink or two.” Gamino initially told police that he and defendant had nothing to drink during dinner, then admitted they had a “cocktail or so,” but “no idea” how many. Gamino eventually claimed defendant had no more than two drinks, but he did not know whether defendant had anything to drink before he started making dinner. In describing defendant’s driving prior to the collision, Gamino told police that although he and defendant were only a car length apart while waiting for the light at the intersection of Alameda de las Pulgas and Woodside, defendant “was a long ways in front” of him after the turn onto Woodside. Indeed, Gamino had just made the turn when the crash *1220 occurred. Acknowledging the large vodka bottle that was more than half empty and the four missing tonic bottles, Gamino said, “Oh no, no, no, no. That was yesterday.”

Defense Case

Kent E. Boots, who was retired from the Orange County Sheriff’s Department and now performs collision reconstruction, disputed the drag factor calculation on which the prosecution’s experts relied. He also denied that a driver on Woodside could lose his right of way because of excessive speed.
Traffic accident reconstructionist Christopher David Kauderer estimated that the Mercedes’s preimpact speed was between 49 and 53 miles per hour and the Nissan’s preimpact speed was between seven and nine miles per hour. He opined that the driver of the Nissan entered the roadway suddenly, violating the Mercedes’s right of way, and that the driver of the Mercedes did not have sufficient time to react. Kauderer did not believe there was enough information to assign an appropriate drag factor to the Mercedes; the estimated drag factor had been the basis for the prosecution expert’s estimate of the Mercedes’s speed.
Forensic Toxicologist Kenneth Allen Mark questioned the prosecution expert’s estimate of defendant’s blood-alcohol level at the time of the collision, an estimate that relied on retrograde extrapolation. Because retrograde extrapolation depends on so many factors that were unknown in this case, such as defendant’s burnoff rate, how much food he had consumed and how quickly, the size of his liver, his physiological or emotional state, and whether defendant was in the absorption or elimination phase, Mark testified that it would not be possible to determine, with any degree of certainty, what defendant’s blood-alcohol level had been at the time of the collision. In Mark’s opinion, defendant’s blood-alcohol level at the time of the crash could have been as low as 0.01 or 0.02 percent. The fact that no one detected the odor of alcohol until 10:30 p.m. was consistent with a blood-alcohol level of substantially less than 0.08 percent at the time of the crash. Mark did concede, however, that the odor of vodka is less detectable than that of other liquor and that chewing gum would make detection even more difficult. Mark also stated that the field sobriety tests performed here would not necessarily indicate impairment from alcohol, since those are “highly variable” tests and could have been affected by defendant’s ankle injury.
Paramedic Daniel Giraudo arrived at the scene at 8:24 p.m. He testified that defendant had a perfect score on a test of alertness. Giraudo did not smell alcohol on defendant, and he did not recall whether defendant was chewing gum at the time.

*1221
Rebuttal

Officer David Johnson, who was trained in accident reconstruction, testified that Kauderer’s model vastly understated the Mercedes’s preimpact speed, since the model would imply a drag factor so unreasonably low as to equate to vehicles skidding on ice. Based on the damage to the vehicles, their points of rest, and other information, Johnson estimated that the circumstances were consistent with a preimpact speed for the Mercedes of 67 miles per hour. Johnson further estimated that it would have taken Wong six to nine seconds to look left, right, and left again before pulling out into the intersection and then another three seconds to get to the point of impact. Under those assumptions, the Mercedes would have been between 884 and 1,179 feet away, too far away to be perceived as a hazard.

Arguments of Counsel Concerning Defendant’s Failure to Inquire

Both sides mentioned in argument to the jury the evidence of defendant’s postarrest, pre-Miranda silence.
The district attorney found it “particularly offensive” that defendant “never, ever asked, hey, how are the people in the other car doing? Not once. . . . Now, you step on somebody’s toe or you bump into someone accidentally, what is your first thing out of your mouth? Whoops. I’m sorry. I’m not saying that he has to say sorry as an expression of his guilt or as some kind of confession, but simply as an expression of his regret. Look, I’m sorry those people were hurt, [¶] Not once. Do you know how many officers that he had contact with that evening? Not a single one said that, hey, the defendant asked me how those people were doing. Why is that? Because he knew he had done a very, very, very bad thing, and he was scared, [¶] He was scared or — either that or too drunk to care.”
Defense counsel argued in response that “there was a big point made of Richard Tom didn’t ask about the condition of the people in the other vehicle. He didn’t care. He wasn’t telling the officers — asking the officers, what happened? What’s going on? How are those other people? [j[] And I ask you: What’s that got to do with anything? Does that help prove to you any element of the offense? They kind of stuck it there under consciousness of guilt. Does that have anything to do with the way you’re supposed to look at the evidence in this case? No. It’s there to make you dislike Mr. Tom, make you think he’s a bad person, therefore, get you closer to deciding he’s the one who caused this accident. [|] My response to that, by the way, would be, police know at 8:53 there’s a fatality in this case. I asked . . . Sergeant Bailey, Officer Price, did you ever tell Richard Tom this was — there was a fatality, between 8:53 and his arrest around eleven o’clock? They didn’t. Of course *1222 they didn’t. Why would they. But you can’t simultaneously blame him for not asking and not blame them for not telling.”

The Court of Appeal Decision

The Court of Appeal consolidated the appeal (A124765) with a petition for writ of habeas corpus (A130151). Although defendant did not object on Fifth Amendment grounds to the evidence that he failed to inquire about the occupants of the other vehicle (nor did he object to the prosecutor’s argument on that basis), the Court of Appeal addressed the merits of the Fifth Amendment claim and reversed the judgment. The Court of Appeal concluded that defendant was under de facto arrest when he was transported to the police station in a patrol vehicle at 9:48 p.m.; that “the right of pretrial silence under Miranda is triggered by the inherently coercive circumstances attendant to a de facto arrest”; that the trial court therefore erred in admitting evidence in the prosecution’s case-in-chief of defendant’s postarrest, preMiranda failure to inquire about the welfare of the occupants of the other vehicle; and that the error was prejudicial under Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. As to whether defendant ever invoked his privilege against self-incrimination, the court said simply that “ ‘the defendant who stands silent must be treated as having asserted it.’ ” (Quoting U.S. v. Moore (D.C. Cir. 1997) 322 U.S. App.D.C. 334 [104 F.3d 377, 384].)
We granted the People’s petition for review. Our grant was limited to the admissibility of defendant’s postarrest silence under the Fifth Amendment. No party challenged in the petition for review, the answer to the petition, or the extensive briefing here the Court of Appeal’s decision to address the Fifth Amendment claim on the merits, nor does the Court of Appeal’s conclusion on this procedural point present an issue worthy of review. (Cal. Rules of Court, rules 8.500(b)(1), 8.516(a), (b); Southern Cal. Ch. of Associated Builders etc. Com. v. California Apprenticeship Council (1992) 4 Cal.4th 422, 431, fn. 3 [14 Cal.Rptr.2d 491, 841 P.2d 1011].) We therefore will accept the lower court’s conclusion that defendant’s claim is cognizable (see People v. Weiss (1999) 20 Cal.4th 1073, 1076-1077 [86 Cal.Rptr.2d 337, 978 P.2d 1257]) and turn to the issue presented in the petition for review — namely, whether the trial court violated the Fifth Amendment privilege against self-incrimination by admitting evidence that defendant, during the period following his arrest but prior to receipt of Miranda warnings, failed to inquire about the welfare of the occupants of the other vehicle.
Discussion
The Fifth Amendment’s self-incrimination clause states that “[n]o person . . . shall be compelled in any criminal case to be a witness against *1223 himself . . . .” (U.S. Const., 5th Amend.) The clause does not, however, “establish an unqualified ‘right to remain silent.’ ” (Salinas, supra, 570 U.S. at p. _ [133 S.Ct. at p. 2183] (plur. opn. of Alito, J.).) “By definition, ‘a necessary element of compulsory self-incrimination is some kind of compulsion.’ ” {Lakeside v. Oregon (1978) 435 U.S. 333, 339 [55 L.Ed.2d 319, 98 S.Ct. 1091].) The “sole” form of compulsion targeted by the Fifth Amendment privilege is “governmental coercion” — not “ ‘moral and psychological pressures . . . emanating from sources other than official coercion’ ” or the absence of “ ‘free choice’ in any broader sense of the word.” (Colorado v. Connelly (1986) 479 U.S. 157, 170 [107 S.Ct. 515, 93 L.Ed.2d 473].)
The high court has found governmental coercion where, for example, the prosecutor invites the jury to draw adverse inferences from a defendant’s failure to take the witness stand. (Griffin v. California (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (Griffin).) Although Griffin included a general statement that the Fifth Amendment “forbids either comment by the prosecution on the accused’s silence or instructions by the court that such silence is evidence of guilt” (Griffin, supra, 380 U.S. at p. 615), the court has since clarified that the “broad dicta in Griffin . . . must be taken in the light of the facts of that case” — a prosecutor’s comment on a defendant’s right not to testify at trial. (United States v. Robinson (1988) 485 U.S. 25, 33-34 [99 L.Ed.2d 23, 108 S.Ct. 864].)
Consequently, the Fifth Amendment privilege against self-incrimination does not categorically bar the prosecution from relying on a defendant’s pretrial silence. The prosecution may use a defendant’s pretrial silence as impeachment, provided the defendant has not yet been Mirandvzed. (Fletcher v. Weir (1982) 455 U.S. 603 [71 L.Ed.2d 490, 102 S.Ct. 1309] [postarrest silence]; Jenkins v. Anderson (1980) 447 U.S. 231 [65 L.Ed.2d 86, 100 S.Ct. 2124] {Jenkins) [prearrest silence]; cf. Doyle v. Ohio (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] [postarrest, post-Miranda silence is not admissible as impeachment].) The prosecution may also use a defendant’s prearrest silence in response to an officer’s question as substantive evidence of guilt, provided the defendant has not expressly invoked the privilege. (Salinas, supra, 570 U.S. at p. _ [133 S.Ct. at p. 2178] (plur. opn. of Alito, J.).) Whether postarrest, pr e-Miranda silence in the absence of custodial interrogation may likewise be admitted as substantive evidence of guilt — and thus render a defendant’s uncompelled silence admissible as substantive evidence of guilt or impeachment — has not yet been resolved by this court or the United States Supreme Court.
As noted by both parties, there is a split in the federal circuits and among state courts as to whether the Fifth Amendment bars the government from offering evidence in its case-in-chief of a defendant’s postarrest, pre-Miranda *1224 silence, even where the silence purports to be an assertion of the privilege against self-incrimination. (See U.S. v. Pando Franco (5th Cir. 2007) 503 F.3d 389, 395, fn. 1 [noting the split]; compare State v. Johnson (Minn. Ct.App. 2012) 811 N.W.2d 136, 147-148 [because arrestee “ ‘was under no government-imposed compulsion to speak,’ ” evidence of his silence “did not implicate the Fifth Amendment”] with State v. Mainaaupo (2008) 117 Haw. 235 [178 P.3d 1, 18-20] [comment on arrestee’s exercise of his right to remain silent violated the 5th Amend.].) The People argue that use of a defendant’s postarrest, pre-Miranda exercise of the privilege in the absence of custodial interrogation raises no issue of governmental compulsion and thus is not barred by the Fifth Amendment. (See, e.g., U.S. v. Frazier (8th Cir. 2005) 408 F.3d 1102, 1111 [because “an arrest by itself is not governmental action that implicitly induces a defendant to remain silent,” the admission of defendant’s postarrest, pre-Miranda silence “in the government’s case-in-chief as evidence of guilt did not violate his Fifth Amendment rights”]; U.S. v. Rivera (11th Cir. 1991) 944 F.2d 1563, 1568; Ordway v. Commonwealth (Ky. 2013) 391 S.W.3d 762, 778 [“Where ‘no governmental action induce[s] the defendant to remain silent[,]’ the Miranda-based fairness rationale does not control.”]; People v. Schollaert (1992) 194 Mich.App. 158 [486 N.W.2d 312, 316] [because “defendant’s silence . . . did not occur during a custodial interrogation situation, nor was it in reliance on the Miranda warnings . . . ,” it “was not a constitutionally protected silence”]; State v. Johnson, supra, 811 N.W.2d at p. 148 [“the state did not compel Johnson ‘to speak at the time of his silence’ ”]; State v. Byrne (1988) 149 Vt. 257 [542 A.2d 667, 670] [“As the arresting officer appears only to have commented on pr e-Miranda silence, this eliminates defendant’s claim under the federal constitution.”]; see generally Jenkins, supra, 447 U.S. at pp. 243-244 (cone. opn. of Stevens, J.) [“When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment.”].) Defendant, like the Court of Appeal, counters that the protections of the Fifth Amendment privilege attach as soon as the defendant is in custody (or even earlier), and do not depend on the commencement of custodial interrogation. (See, e.g., U.S. v. Velarde-Gomez (9th Cir. 2001) 269 F.3d 1023, 1029 [“the government may not burden that right by commenting on the defendant’s post-arrest silence at trial”]; U.S. v. Moore, supra, 104 F.3d at p. 385 [“neither Miranda nor any other case suggests that a defendant’s protected right to remain silent attaches only upon the commencement of questioning as opposed to custody”]; U.S. v. Burson (10th Cir. 1991) 952 F.2d 1196, 1200 [“silence . . . exhibited in a non-custodial interrogation” is protected by the 5th Amend.]; State v. Mainaaupo, supra, 178 P.3d at p. 18 [quoting Velarde-Gomez and Moore].)
*1225 We need not resolve the split in authority as to whether the Fifth Amendment bars the use of a defendant’s postarrest, pre-Miranda exercise of the privilege against self-incrimination in the absence of custodial interrogation. Even assuming the privilege against self-incrimination protects against evidentiary use of postarrest silence in this context, the high court has “long acknowledged” (Minnesota v. Murphy (1984) 465 U.S. 420, 427 [79 L.Ed.2d 409, 104 S.Ct. 1136]) that the privilege “is not self-executing” and “may not be relied upon unless it is invoked in a timely fashion” (Roberts v. United States (1980) 445 U.S. 552, 559 [63 L.Ed.2d 622, 100 S.Ct. 1358]). We conclude that defendant had the burden to establish that he clearly invoked the privilege here.
A
In Davis v. United States (1994) 512 U.S. 452 [129 L.Ed.2d 362, 114 S.Ct. 2350], the high court held that a suspect who wishes to invoke the right to counsel during a custodial interview must do so “unambiguously.” (Id. at p. 459.) “Although a suspect need not ‘speak with the discrimination of an Oxford don,’ [citation], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.” (Ibid.) To avoid difficulties of proof and to provide guidance to officers conducting interrogations — who must promptly cease questioning once a suspect has invoked the right to counsel — the inquiry is an objective one. (Id. at pp. 458-459.)
Berghuis v. Thompkins (2010) 560 U.S. 370 [176 L.Ed.2d 1098, 130 S.Ct. 2250] (Berghuis) considered the standard required to invoke the privilege against self-incrimination during a custodial interrogation. Declaring that “there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel at issue in Davis,” the high court concluded that an accused who wants to invoke the right to remain silent must likewise “do so unambiguously.” (Berghuis, supra, 560 U.S. at p. 381.) “A requirement of an unambiguous invocation of Miranda rights results in an objective inquiry that ‘avoid[s] difficulties of proof and . . . provide[s] guidance to officers’ on how to proceed in the face of ambiguity. [Citation.] If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused’s unclear intent and face the consequences of suppression ‘if they guess wrong.’ ” (Berghuis, supra, 560 U.S. at pp. 381-382.)
Salinas then applied the objective invocation rule outside the context of a custodial interrogation. In that case, police visited Genovevo Salinas at his home as part of a murder investigation. Salinas agreed to hand over his *1226 shotgun for ballistics testing and to accompany police to the station for questioning. The parties agreed that the interview was noncustodial and that Salinas had not been provided with Miranda warnings. Salinas answered most of the questions during the interview. But when asked whether his shotgun would match the shotgun shells recovered at the murder scene, Salinas “ ‘[l]ooked down at the floor, shuffled his feet, bit his bottom lip, cl[e]nched his hands in his lap, [and] began to tighten up.’ ” (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2178] (plur. opn. of Alito, J.).) He then answered the officer’s remaining questions. (Ibid.)
Salinas did not testify at trial, but the prosecution used his silence in reaction to the interview question about the shotgun as evidence of his guilt. (Salinas, supra, 570 U.S. at p. _ [133 S.Ct. at p. 2178] (plur. opn. of Alito, J.).) The Supreme Court granted certiorari to resolve the split of authority as to “whether the prosecution may use a defendant’s assertion of the privilege against self-incrimination during a noncustodial police interview as part of its case in chief,” but the plurality “f[ou]nd it unnecessary to reach that question” “because petitioner did not invoke the privilege during his interview.” (Id. at p._[133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).)
The Salinas plurality began its analysis by explaining that “[t]he privilege against self-incrimination ‘is an exception to the general principle that the Government has the right to everyone’s testimony.’ [Citation.] To prevent the privilege from shielding information not properly within its scope, we have long held that a witness who ‘ “desires the protection of the privilege . . . must claim it” ’ at the time he relies on it.” (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).)[3] Salinas failed to do so. He answered the officer’s questions for most of the interview, declined to answer whether his shotgun would match the shells recovered at the murder scene, and then offered answers to the officer’s remaining questions. (570 U.S. at p._[133 S.Ct. at p. 2178] (plur. opn. of Alito, J.).) There was no violation of the Fifth Amendment in admitting evidence of the defendant’s silence, the plurality concluded, “because he did not expressly *1227 invoke the privilege against self-incrimination in response to the officer’s question.” (570 U.S. at p._[133 S.Ct. at p. 2178].)
In justifying the application of the objective invocation rule in this new context, the plurality relied on the same two concerns the court had identified in previous cases — i.e., the need to avoid difficulties of proof and the need to provide guidance to law enforcement officers. (Salinas, supra, 570 U.S. at p. _ [133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).) The objective invocation requirement “ensures that the Government is put on notice when a witness intends to rely on the privilege so that it may either argue that the testimony sought could not be self-incriminating [citation] or cure any potential self-incrimination through a grant of immunity [citation].” (Ibid.) The requirement “also gives courts tasked with evaluating a Fifth Amendment claim a contemporaneous record establishing the witness’ reasons for refusing to answer.” (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).)
Subsequent to Salinas, the Sixth Circuit held that the objective invocation rule applies not only when the suspect, prior to arrest, declines to answer a question, but also “where, as here, the silence did not occur in response to interrogation.” (Dis. opn. of Liu, J., post, at p. 1249.) In Abby v. Howe (6th Cir. 2014) 742 F.3d 221, Abby’s fiancée testified for the prosecution, without objection, that he was hiding at her house when police came to interview her and that “although he probably could hear her talking to the detectives, Abby opted to stay concealed in a bedroom.” (Id. at p. 224.) A “ ‘running theme’ ” of the prosecution’s argument to the jury (id. at p. 227), again without an objection, was “that Abby hid in the bedroom rather than talking to the police while they were at [the fiancée]’s house” (id. at p. 224). The court concluded that Abby could not have been prejudiced by counsel’s failure to object to the evidence of Abby’s prearrest silence “because we now know that such an objection would be futile in light of Salinas.” (Id. at p. 228.)
An unpublished decision of the Texas Court of Appeals then applied the objective invocation rule to a defendant’s postarrest, pre-Miranda silence. In Torres v. State (Tex.App., June 12, 2014, No. 10-12-00263-CR) 2014 Tex.App. Lexis 6354, a police officer spotted several items in the defendant’s vehicle that matched the description of items reported stolen and testified that the defendant offered no explanation as to why those items were in the back of his vehicle. (Id. at pp. *7-*8.) Relying on Salinas, the court concluded that the defendant “did not invoke his Fifth Amendment rights when he refused to offer an explanation to police for the items found in the back seat of the vehicle.” (Id. at p. *9; see U.S. v. Jones (E.D.N.Y., Mar. 11, 2014, No. 13-CR-438 (NGG)) 2014 U.S.Dist. Lexis 32032, pp. *17-* 18 [postarrest *1228 silence was admissible where arrestee, who “initiated conversation” preMiranda “and then fell quiet after a brief back and forth,” did not unequivocally assert the privilege].)
We likewise conclude that the objective invocation rule applies to defendant’s postarrest, pre-Miranda silence. {U.S. v. Graves (4th Cir., Jan. 13, 2014, No. 12-4416) 2014 U.S.App. Lexis 617, p. *12 [describing Salinas as a decision “[djrawing no distinction between the invocation requirements before and after custody and Miranda warnings”].) Here, as in the situations discussed above, the objective invocation rule “ ‘avoid[s] difficulties of proof and . . . provide[s] guidance to officers’ on how to proceed in the face of ambiguity.” (Berghuis, supra, 560 U.S. at p. 381.) Without clear notice a suspect has invoked the privilege, the police would be deprived of the opportunity to “cure any potential self-incrimination through a grant of immunity.” (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).) Moreover, because an invocation of the privilege must be “ ‘scrupulously honored’ ” (Michigan v. Mosley (1975) 423 U.S. 96, 104 [46 L.Ed.2d 313, 96 S.Ct. 321]), a defendant who is deemed to have validly invoked the privilege may not be interrogated thereafter unless counsel has first been made available to the defendant or the defendant initiates further communications with the police (People v. Sims (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992]). If an ambiguous act, omission, or statement could qualify as an invocation, “police would be required to make difficult decisions about an accused’s unclear intent and face the consequences of suppression ‘if they guess wrong.’ ” (Berghuis, supra, 560 U.S. at p. 382.) Accordingly, the threshold inquiry in assessing the scope of the privilege against self-incrimination in the postarrest, pre-Miranda context is whether a reasonable police officer in the circumstances would understand that the defendant had invoked the privilege either at or prior to the silence at issue. (See Davis v. United States, supra, 512 U.S. at p. 459; accord, People v. Musselwhite (1998) 17 Cal.4th 1216, 1238 [74 Cal.Rptr.2d 212, 954 P.2d 475]; cf. U.S. v. Okatan (2d Cir. 2013) 728 F.3d 111, 118 [the threshold inquiry concerning the admissibility of prearrest silence is “whether the defendant’s silence constituted an ‘assertion of the privilege against self-incrimination’ ”].)
B
The general rule that a witness who intends to rely on the privilege against self-incrimination must clearly invoke it has two “well-defined” exceptions. (Minnesota v. Murphy, supra, 465 U.S. at p. 429; see Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).) Neither applies here.
First, a criminal defendant need not take the stand and assert the privilege at his or her own trial. (Salinas, supra, 570 U.S. at p._[133 S.Ct. *1229 at p. 2179] (plur. opn. of Alito, J.), citing Griffin, supra, 380 U.S. at pp. 613-615.) An unambiguous invocation of the privilege at trial “would serve no purpose; neither a showing that his testimony would not be self-incriminating nor a grant of immunity could force him to speak.” (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).) The Griffin exception does not apply here, and defendant does not contend otherwise.
Second, “a witness’ failure to invoke the privilege must be excused where governmental coercion makes his forfeiture of the privilege involuntary.” (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2180] (plur. opn. of Alito, J.).) This exception applies when the government forces a choice between self-incrimination and some important public benefit such as public employment (Garrity v. New Jersey (1967) 385 U.S. 493, 496-498 [17 L.Ed.2d 562, 87 S.Ct. 616], public office (Lefkowitz v. Cunningham (1977) 431 U.S. 801, 804-806 [53 L.Ed.2d 1, 97 S.Ct. 2132]), or public contracts {Lefkowitz v. Turley (1973) 414 U.S. 70, 84-85 [38 L.Ed.2d 274, 94 S.Ct. 316]). (See Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2180] (plur. opn. of Alito, J.).) This exception can apply also when a regulatory regime makes the act of invoking the privilege — thereby identifying oneself to the government — inherently incriminating. (Leary v. United States (1969) 395 U.S. 6, 28-29 [23 L.Ed.2d 57, 89 S.Ct. 1532]; Albertson v. SACB (1965) 382 U.S. 70, 79 [15 L.Ed.2d 165, 86 S.Ct. 194].) And this exception can arise most commonly in the “inherently coercive environment created by . . . custodial interrogation” (Pennsylvania v. Muniz (1990) 496 U.S. 582, 599 [110 L.Ed.2d 528, 110 S.Ct. 2638]), where the Miranda court took the “extraordinary safeguard” of disallowing use in the case-in-chief of unwarned statements elicited during such interrogation (Minnesota v. Murphy, supra, 465 U.S. at p. 430). “Due to the uniquely coercive nature of custodial interrogation, a suspect in custody cannot be said to have voluntarily forgone the privilege ‘unless [he] fails to claim [it] after being suitably warned.’ ” (Salinas, supra, 570 U.S. at p. _ [133 S.Ct. at p. 2180] (plur. opn. of Alito, J.).)
Defendant, like Justice Liu’s dissent, seizes on the last of these scenarios, seeking to distinguish Salinas on the ground that the defendant there was deemed not to be in custody. But custody alone — in this case, a de facto arrest[4] — does not deny an individual “ ‘a “free choice to admit, deny, or to refuse to answer.” ’ ” (Minnesota v. Murphy, supra, 465 U.S. at p. 429.) To the contrary, the high court has rejected the contention that “ ‘an arrest, by *1230 itself, is governmental action which implicitly induces a defendant to remain silent’ ” (Fletcher v. Weir, supra, 455 U.S. at p. 606, quoting Weir v. Fletcher (6th Cir. 1981) 658 F.2d 1126, 1131) and has emphasized that the uniquely coercive environment that triggers the Miranda protections occurs “not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. ‘Interrogation,’ as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.” (Rhode Island v. Innis (1980) 446 U.S. 291, 300 [64 L.Ed.2d 297, 100 S.Ct. 1682].) Neither defendant nor the dissent explains how the de facto arrest here “deprived [him] of the ability to voluntarily invoke the Fifth Amendment.” (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2180] (plur. opn. of Alito, J.); cf. Jenkins, supra, 447 U.S. at p. 240 [“no governmental action induced petitioner to remain silent before arrest”].)
The line between custody and custodial interrogation is a significant one. According to the United States Supreme Court, Miranda — and the custodial interrogation on which it relies — represents “a limited exception to the rule that the privilege must be claimed.” (Roberts v. United States (1980) 445 U.S. 552, 560 [63 L.Ed.2d 622, 100 S.Ct. 1358] {Roberts).) Because the high court has instructed that “the exception [to the objective invocation rule] does not apply outside the context of the inherently coercive custodial interrogations for which it was designed” {ibid.), we decline to extend the exception beyond its boundaries and therefore conclude that the objective invocation rule applies here.
Indeed, Roberts itself applied the objective invocation rule to a defendant who had been arrested. In that case, evidence was admitted at sentencing that the defendant had refused over a period of three years, preceding and following his arrest, to cooperate with the investigation of a criminal conspiracy in which he was a confessed participant. {Roberts, supra, 445 U.S. at pp. 553, 557.) In response to the defendant’s complaint that use of his silence punished him for exercising his Fifth Amendment privilege against self-incrimination, the high court recognized, as we do here, that the privilege “is not self-executing” and “may not be relied upon unless it is invoked in a timely fashion.” {Roberts, supra, 445 U.S. at p. 559.) Berghuis, too, applied the general invocation rule to an arrestee who answered some questions and then fell silent. (Berghuis, supra, 560 U.S. at pp. 381-382.) The Salinas plurality relied on both Roberts and Berghuis as support for the objective invocation rule. (Salinas, supra, 570 U.S. at pp. - [133 S.Ct. at pp. 2181-2182] (plur. opn. of Alito, J.).)
Where a defendant could have invoked his privilege against self-incrimination at any point — but failed to do so — the prosecution’s use in its case-in-chief of the defendant’s postarrest, pre-Miranda silence in the absence of interrogation cannot be deemed a “penalty ... for exercising a *1231 constitutional privilege” within the meaning of Griffin, supra, 380 U.S. at page 614. Nor does use of a defendant’s postarrest, pre-Miranda silence in the absence of interrogation subject him to the “cruel trilemma” of incriminating himself, lying, or demonstrating his guilt by silence. (Murphy v. Waterfront Comm’n (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 84 S.Ct. 1594].) No such quandary arises because he could have invoked his privilege against self-incrimination without penalty at any point before or after his arrest.
C
Although Salinas emphatically refused to adopt a “third exception” to “the ‘general rule’ that a witness must assert the privilege to subsequently benefit from it” (Salinas, supra, 570 U.S. at pp.___-__[133 S.Ct. at pp. 2180-2181] (plur. opn. of Alito, J.)), Justice Liu’s dissent depends entirely on the recognition of such an exception. In the view of the dissent, all postarrest, pr e-Miranda silence should be inadmissible, even though “the true reason” for the custodial silence may be “something other” than the intent to invoke the privilege in an individual case. (Dis. opn. of Liu, J., post, at p. 1253.) It is difficult to square the dissent’s approach with its concession that the Fifth Amendment “protects silence that constitutes an exercise of the privilege against self-incrimination, not silence attributable to other reasons.” (Dis. opn. of Liu, J., post, at p. 1248.)
To reconcile those two positions, Justice Liu’s dissent theorizes that Salinas’ s reliance on the general rule was “premised on the relatively uncertain reasons for silence in the noncustodial context,” and posits that silence after an arrest “gives rise to a much stronger inference of reliance on the Fifth Amendment privilege.” (Dis. opn. of Liu, J., post, at p. 1252.) But the application of the objective invocation rule in Salinas rested not on the likelihood that a suspect in general might wish to rely on the privilege in the prearrest context, but on the fact that Salinas “alone knew why he did not answer the officer’s question.” (Salinas, supra, 570 U.S. atp._[133 S.Ct. at p. 2182] (plur. opn. of Alito, J.).) Indeed, Salinas explicitly acknowledged “that reliance on the Fifth Amendment privilege is the most likely explanation for silence in a case such as this one,” yet deemed that likelihood to be insufficient to justify an exception to the general rule. (Ibid., italics added.) Although a suspect, before or after arrest, may choose to remain silent in reliance on the constitutional privilege, the suspect may also be silent “because he is trying to think of a good lie, because he is embarrassed, or because he is protecting someone else. Not every such possible explanation for silence is probative of guilt, but neither is every possible explanation protected by the Fifth Amendment.” (Ibid.) To distinguish between those silences that are protected by the privilege from those that are not, it is the defendant’s “ ‘burden ... to make a timely assertion of the privilege.’ ” *1232 (Ibid.) Here, as in most other contexts, the protections of the privilege hinge on whether the defendant clearly invoked the privilege — “popular misconceptions notwithstanding.” (Ibid.)
Moreover, “ ‘the general principle that the Government has the right to everyone’s testimony’ ” (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2183] (plur. opn. of Alito, J.)) unquestionably applies to testimony by silence. As Salinas made clear, the objective invocation rule “applies with equal force,” “regardless of whether prosecutors seek to use silence or a confession that follows.” (Id. at p._[133 S.Ct. at p. 2182] (plur. opn. of Alito, J.).)
D
Defendant relies heavily on two pre-Miranda[5] decisions, People v. Cockrell (1965) 63 Cal.2d 659 [47 Cal.Rptr. 788, 408 P.2d 116] and In re Banks (1971) 4 Cal.3d 337 [93 Cal.Rptr. 591, 482 P.2d 215], to argue that his postarrest silence was inadmissible, but his reliance is misplaced. Both cases involved the admissibility of silence in the face of custodial interrogation. In Cockrell, it was the defendant’s postarrest silence in the face of an officer’s question as to “what he had to say about” a codefendant’s accusation. (Cockrell, supra, 63 Cal.2d at p. 669.) Anticipating the Miranda decision, we said that the Fifth Amendment “proscribes drawing an inference adverse to the defendant from his failure to reply to an accusatory statement if the defendant was asserting his constitutional privilege against self-incrimination” and that the privilege could be recognized in the context of custodial interrogation even if the defendant did not “express[ly] claim” it. (Cockrell, supra, 63 Cal.2d at pp. 669-670, italics added; accord, Salinas, supra, 570 U.S. at p. _ [133 S.Ct. at p. 2180] (plur. opn. of Alito, J.).) In Banks, it was the use of a defendant’s silence in the face of an accusation and search of his person by a police officer and in the face of an accusation by a witness viewing the defendant at a postarrest police lineup. (Banks, supra, 4 Cal.3d at pp. 345, 347.) The People conceded that Cockrell applied to the defendant’s silence in the face of the accusation at the postarrest lineup, but argued that it did not apply to his silence in the face of the police officer’s accusation, given that the defendant had not yet been formally arrested at the time the police officer searched him. (Banks, supra, 4 Cal.3d at p. 352.) We held that the prohibition on commenting on a defendant’s silence in the face of custodial interrogation “certainly” applies where “ ‘a person has been taken into custody or otherwise deprived of his freedom of action in any significant way,’ ” even if he *1233 “may not have been formally arrested at the moment the police began to search him.” (Ibid., quoting Miranda, supra, 384 U.S. at p. 444; see generally California v. Beheler (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 103 S.Ct. 3517] [“the ultimate inquiry” as to “whether a suspect is ‘in custody’ ” under Miranda is “whether there is a ‘formal arrest or restraint on freedom of movement’ of the degree associated with a formal arrest”].) Neither case considered the admissibility of a defendant’s postarrest, pre-Miranda silence prior to custodial interrogation or whether the burden was on the defendant to invoke the privilege in those circumstances.
Indeed, none of the cases cited by defendant or his amicus curiae analyzes the threshold question whether the privilege must be timely and unambiguously invoked if the defendant wishes to bar use of postarrest, pre-Miranda silence that occurs in the absence of custodial interrogation. In many of the cited cases, the defendant actually invoked his rights. (U.S. v. Okatan, supra, 728 F.3d at p. 118 [“. . . Okatan successfully asserted the privilege when he told [the Border Patrol agent] that he wanted a lawyer”]; Combs v. Coyle (6th Cir. 2000) 205 F.3d 269, 286 [“. . . Combs clearly invoked the privilege against self-incrimination by telling the officer to talk to his lawyer, thus conveying his desire to remain silent without a lawyer present”]; U.S. v. Burson, supra, 952 F.2d at p. 1200 [“we have little trouble in concluding Mr. Burson invoked his privilege against self-incrimination”]; Coppola v. Powell (1st Cir. 1989) 878 F.2d 1562, 1567 [“petitioner’s statement invoked his privilege against self-incrimination”]; U.S. ex rel. Savory v. Lane (7th Cir. 1987) 832 F2d 1011, 1015 [defendant told police “that ‘he didn’t want to talk about it, he didn’t want to make any statements’ ”].) One case involved a defendant’s silence in response to unwarned custodial interrogation, which is the classic exception set forth in Miranda to the objective invocation rule. (U.S. v. Velarde-Gomez, supra, 269 F.3d at p. 1032 [holding inadmissible “the use of silence in the face of questioning about incriminating evidence”].) Another case simply assumed that mere silence necessarily invoked the privilege without considering whether or how that silence, along with the other circumstances, made it clear that the defendant was invoking the privilege. (U.S. v. Moore, supra, 104 F.3d at p. 385 [“the defendant who stands silent must be treated as having asserted it”]; see U.S. v. Osuna-Zepeda (8th Cir. 2005) 416 F.3d 838, 846 (cone. opn. of Lay, J.) [“For purposes of the Fifth Amendment, silence is the same as a statement invoking the right to remain silent.”].) The remainder simply fail to consider the threshold question of invocation of the privilege altogether. (U.S. v. Whitehead (9th Cir. 2000) 200 F.3d 634, 637-639 (en banc); U.S. v. Hernandez (7th Cir. 1991) 948 F.2d 316, 322-324; State v. VanWinkle (2011) 229 Ariz. 233 [273 P.3d 1148, 1150-1152].) Consequently, none is persuasive authority on the question whether “the ‘general rule’ ” that a witness must clearly and timely “assert *1234 the privilege to subsequently benefit from it” (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2181]) applies in these circumstances.
E
The Court of Appeal also feared that, as a policy matter, allowing comment on a defendant’s postarrest, pr e-Miranda silence prior to custodial interrogation would “ ‘create an incentive for arresting officers to delay interrogation in order to create an intervening “silence” that could then be used against the defendant.’ ” (Quoting U.S. v. Moore, supra, 104 F.3d at p. 385.) But a defendant could easily eliminate any such risk by clearly and timely invoking the privilege. Moreover, the Court of Appeal’s assumption that a delay in interrogation is necessarily unjustified ignores the government’s interest in ensuring that questioning be conducted under circumstances that allow for proper documentation of the interview by law enforcement personnel who are trained in interrogation techniques. Indeed, the record here showed that defendant needed to be taken to the station not only to give a detailed taped statement, but also to provide a blood sample — which was required by department policy in all major injury collisions and likewise could be done only in a controlled environment. (Cf. Missouri v. Seibert (2004) 542 U.S. 600, 621 [159 L.Ed.2d 643, 124 S.Ct. 2601] (cone. opn. of Kennedy, J.) [post-warning interview following use of “the two-step technique” was inadmissible where the tactic was a “deliberate” attempt to undermine the Miranda warning and there were no “legitimate objectives that might otherwise justify its use”].)
In any event, the same incentive to delay Miranda warnings already exists by virtue of the high court’s decision in Fletcher v. Weir, supra, 455 U.S. 603, which allows a defendant’s postarrest, pre-Miranda silence to be used as impeachment. (See People v. Fondron (1984) 157 Cal.App.3d 390, 397, 398 [204 Cal.Rptr. 457] [“this procedure,” i.e., “ ‘manipulating] the facts by asking no questions immediately after the arrest, in order to use the defendant’s silence against him,’ ” “is approved by United States Supreme Court precedent”].) In fact, the Sixth Circuit decision in Weir v. Fletcher, supra, 658 F.2d 1126, which the high court overturned in its per curiam opinion, rested on precisely the same policy argument — i.e., that allowing postarrest, pre-Miranda silence to be used for impeachment “would discourage the reading of Miranda warnings” at the time of arrest. (Weir v. Fletcher, supra, 658 F.2d at p. 1132.) The Sixth Circuit feared in particular that “[t]he police could simply arrest a suspect and be careful not to interrogate him for 15-20 minutes. If the police wanted to question the suspect, they could then read the Miranda warnings. If the suspect had remained silent for those 15-20 minutes, that silence could then be used for impeachment at trial.” (Ibid.) Neither defendant nor the Court of Appeal has explained why this, concern, *1235 which failed to persuade the high court in Fletcher v. Weir, supra, 455 U.S. 603, should have any greater force here. (See generally Thompson, Evading Miranda; How Seibert and Patane Failed to “Save” Miranda (2006) 40 Val. U. L.Rev. 645, 655 [“The Supreme Court did not share the circuit court’s concerns about losing the benefits of prompt warnings by creating an incentive deliberately to delay warnings”; thus, “the Fletcher case means that the government always benefits from delaying the issuance of warnings”].) Indeed, given that police officers confronting a suspect have no way of knowing whether the suspect will speak or remain silent (or even whether the suspect would take the stand at an eventual trial), the incentive to delay Miranda warnings in hopes of obtaining silence that could be used in the case-in-chief or as impeachment must be a very weak one. (See Snyder, A Due Process Analysis of the Impeachment Use of Silence in Criminal Trials (1988) 29 Wm. & Mary L.Rev. 285, 324, fn. 222.)[6]
F
The Court of Appeal, which did not have the benefit of the Salinas decision, found a violation of the Fifth Amendment privilege in the admission of defendant’s postarrest, pre-Miranda silence based solely on the fact defendant was in custody and was silent as to the welfare of the others involved in the crash, without considering whether or when defendant ever invoked the privilege. This was error. As stated, a defendant must invoke the privilege in order to claim its protections, and the invocation must be “unambiguous.” (Berghuis, supra, 560 U.S. at p. 381.) The record here shows that defendant answered Officer Price’s questions as to what happened when Price first arrived at the scene, that defendant asked the officers whether he could go home, that defendant complained to police about an ankle injury, and that defendant expressed reluctance about going to the police station to have his blood drawn but eventually agreed to go to the station. Following his de facto arrest, defendant continued to speak with the officers. In particular, he asked at the station whether he could refuse to have his blood drawn and he asked for permission to use the bathroom and for an aspirin. Whether *1236 these or other circumstances made it clear to the officers that he had invoked his privilege against self-incrimination is for the Court of Appeal to analyze in the first instance, along with the remainder of defendant’s claims, if necessary. (See id. at p. 406, fn. 6 (dis. opn. of Sotomayor, J.).)
Our conclusion that use of a defendant’s postarrest, pre-Miranda silence is not barred by the Fifth Amendment in the absence of custodial interrogation or a clear invocation of the privilege does not mean that evidence overcoming those constitutional hurdles would necessarily be admissible under the Evidence Code. (People v. Aquino (1992) 239 Ill.App.3d 12 [178 Ill.Dec. 890, 605 N.E.2d 684, 688] [“ ‘difficulties of inference [concerning postarrest silence] are subjects for state law’ ”]; cf. Fletcher v. Weir, supra, 455 U.S. at p. 607 [“A State is entitled ... to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant’s own testimony.”]; Jenkins, supra, 447 U.S. at p. 239.) The probative value of a defendant’s silence depends peculiarly on a careful assessment of all of the relevant circumstances. (Compare Bilokumsky v. Tod (1923) 263 U.S. 149, 153-154 [68 L.Ed. 221, 44 S.Ct. 54] [“Silence is often evidence of the most persuasive character.”] with United States v. Hale (1975) 422 U.S. 171, 176 [45 L.Ed.2d 99, 95 S.Ct. 2133] [“In most circumstances silence is so ambiguous that it is of little probative force.”].) In the context of silence that immediately precedes or follows an arrest, some courts have held that the defendant’s silence in the circumstances presented was “too ambiguous to have probative value as an indicator of guilt and any probative value would be outweighed by the prejudice to the defendant at trial.” (Weitzel v. State (2004) 384 Md. 451 [863 A.2d 999, 1003].) One source of ambiguity is the ubiquity of Miranda warnings in popular culture and the extent to which a defendant may have subjectively intended to rely on the privilege, even if that intent was not communicated to law enforcement officers. (See Ex Parte Marek (Ala. 1989) 556 So.2d 375, 381; People v. Quintana (Colo. 1983) 665 P.2d 605, 610-611; People v. Aquino, supra, 605 N.E.2d at p. 688; Weitzel, supra, 863 A.2d at p. 1005; Irwin v. Commonwealth (2013) 465 Mass. 834 [992 N.E.2d 275, 289]; Morris v. State (1996) 112 Nev. 260, [913 P.2d 1264, 1267]; People v. DeGeorge (1989) 73 N.Y.2d 614 [543 N.Y.S.2d 11, 541 N.E.2d 11, 13].) The probative value of the evidence will also depend on the extent to which one would expect a person in the particular circumstances to speak or volunteer a statement. (See State v. Deatore (1976) 70 NJ. 100 [358 A.2d 163, 174] (cone. opn. of Sullivan, J.).) Whether and how these factors should weigh in these particular circumstances — where the defendant spoke freely about the circumstances of the collision and his own needs but never inquired about the status of the others involved in the collision, despite the extensive damage to their vehicle — is beyond the scope of our grant of *1237 review, but they remain available for the Court of Appeal to consider on remand if presented with a claim of error on those grounds.
In future cases, the better practice for a party seeking to offer evidence of postarrest, pr e-Miranda silence or a party seeking to exclude such evidence is to proceed by way of a motion in limine, which will offer the trial court the opportunity to develop a record as to whether the circumstances would have made it clear to the officer that the defendant had invoked the privilege against self-incrimination, whether the evidence of silence is relevant, and, if so, whether its probative value is substantially outweighed by the probability of undue consumption of time or undue prejudice under Evidence Code section 352.
Disposition
The judgment of the Court of Appeal is reversed and the matter is remanded for further proceedings consistent with this opinion.
Cantil-Sakauye, C. J., Chin, J., and Corrigan, J., concurred.

 Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (Miranda).

 Neighbor Nico Roundy testified that he did not hear any braking before the “really loud bang” at the intersection.

 Justice Alito’s plurality opinion was joined by Chief Justice Roberts and Justice Kennedy. Justice Thomas, joined by Justice Scalia, concurred separately, expressing the view that Griffin was wrongly decided and therefore “. . . Salinas’ claim would fail even if he had invoiced the privilege because the prosecutor’s comments regarding his precustodial silence did not compel him to give self-incriminating testimony.” (Salinas, supra, 570 U.S. at p._ [133 S.Ct. at p. 2184] (cone. opn. of Thomas, J.).) Because the circumstances in which the plurality opinion deemed prearrest silence to be admissible — i.e., when the defendant has not expressly invoked the privilege — is a logical subset of the concurring opinion’s view that prearrest silence is admissible regardless of whether the defendant invoked the privilege, the rule set forth in the plurality opinion states the holding of the court. (See Marks v. United States (1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 97 S.Ct. 990]; U.S. v. Epps (D.C. Cir. 2013) 404 U.S. App.D.C. 39 [707 F.3d 337, 348-351].)

 Defendant was not formally arrested until approximately 11:00 p.m. The Court of Appeal determined that the restraint on defendant’s freedom of movement ripened into a de facto arrest at 9:48 p.m., when police transported him and his girlfriend in a patrol vehicle to the police station for a blood test and interview.

 Cockrell was tried and convicted in January 1963 (People v. Cockrell, supra, 63 Cal.2d at p. 662); Banks was tried and convicted in August 1962 (In re Banks, supra, 4 Cal.3d at p. 340). In People v. Rollins (1967) 65 Cal.2d 681, 686 [56 Cal.Rptr. 293, 423 P.2d 221], we decided to follow “the conclusion of the United States Supreme Court that Miranda should not extend to trials which began before June 13, 1966.”

 Some state courts view the calculus differently and have interpreted their own constitutions to bar the use of postarrest, pre-Miranda silence for impeachment. (E.g., Adams v. State (Alaska 2011) 261 P.3d 758, 765; State v. Hoggins (Fla. 1998) 718 So.2d 761, 769-770; Commonwealth v. Spotz (2005) 582 Pa. 207 [870 A.2d 822, 831]; Sanchez v. State (Tex.Crim.App. 1986) 707 S.W.2d 575, 578; State v. Davis (1984) 38 Wn.App. 600 [686 P.2d 1143, 1145].) Although the Court of Appeal used to follow what it called “the ‘California rule,’ ” which likewise “forbade cross-examination or commentary on a defendant’s postarrest silence whether Miranda warnings were given or not” (People v. Delgado (1992) 10 Cal.App.4th 1837, 1841 [13 Cal.Rptr.2d 703]), the truth-in-evidence provision of our state Constitution (Cal. Const., art. I, § 28, subd. (f)(2)), which directs that “ ‘evidence of [a defendant]’s pre-Miranda silence may be excluded only if application of the exclusionary rule is compelled by federal law’ ” (Delgado, supra, 10 Cal.App.4th at p. 1841), now forecloses such a rule.