Filed 8/26/15  P. v. Vo CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066160 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD248370) |
| KURTIS TINH VO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Lorna A. Alksne, Judge.  Affirmed.

Steven J. Carroll, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles Ragland, Scott C. Taylor and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury found defendant Kurtis Tinh Vo guilty of robbery (Pen. Code, § 211)[1] and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)).  Vo additionally admitted having a prior strike conviction (§§ 667, subd. (b)-(i), 1170.12), a prior serious felony conviction (§§ 667, subd. (a)(1), 1192.7, subd. (c)), and a prior prison commitment conviction (§ 667.5, subd. (b)).

Vo appeals, contending the court prejudicially erred by allowing the prosecution to impeach his testimony with post-arrest silence in violation of *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*).  We conclude any error was harmless beyond a reasonable doubt and affirm the judgment.

BACKGROUND

I

*Prosecution's Evidence*

Victor Adams approached the victim at a bar and invited the victim to join him, Vo, and two other men.  The victim joined the group and subsequently agreed to accompany them to a party.  Driven by Vo, the group left the bar and traveled to a nearby park.  Upon arriving, they proceeded down a stairwell leading to the park. When they reached the bottom of the stairs, Vo, Adams and one of the other two men began beating the victim and demanded he hand over his possessions.  They discovered the victim's ATM card and demanded he withdraw all of his money.  Although the victim agreed to

_____

[1]      All further statutory references are to the Penal Code unless otherwise indicated.

2

their demand, they continued beating him because they feared he would report them to the police. They eventually stopped beating him and ran off, taking with them his sweatshirt, shoes, military identification card, ATM card, electronic cigarette and approximately $150 in cash. The victim then got up and ran in the opposite direction through the park and toward a neighborhood, where some people helped him.

San Diego Police Officer Truong Ta received a radio call about the incident and went to the park. While positioned at the top of the stairwell, Officer Ta heard a voice announce, "[T]he police are here" and saw two men in white T-shirts run away. Officer Ta subsequently spotted Vo walking towards him on the sidewalk. Vo was sweating and wearing a white T-shirt covered in plant debris. Officer Ta directed Vo to approach. He then handcuffed Vo and placed him into the back of a patrol car. After leaving Vo to help another officer detain three other suspects, Officer Ta returned to the patrol car, searched Vo and discovered the victim's ATM card and electronic cigarette, as well as $187 cash, in Vo's right front pants pocket. The victim identified Vo as one of his assailants.

A San Diego police detective assigned to investigate the incident interviewed and examined all of the suspects for injuries, except Vo. At trial, when asked by defense counsel why she did not examine Vo for injuries, the detective explained Vo "[had] invoked" and she was not going to "visit him in jail after he wanted to speak to an attorney."

3

## II

### *Vo's Testimony*

### A

### *Direct Examination*

Vo testified on his own behalf. According to him, as the group was driving to the party, they learned it had been cancelled. At Adams's request, Vo drove them to purchase marijuana instead. Upon arriving at the purchase location, Vo and the victim stayed in Vo's car as Adams and the other two men left. The three men returned shortly and the entire group went down the stairs leading to the park. Vo believed they were going to smoke the marijuana they had just purchased. When Vo reached the bottom of the stairs, he saw Adams attacking the victim and demanding money. Vo tried to stop the assault by telling the victim to give his things to Adams so Adams would stop kicking him. Vo also told Adams to stop hurting the victim. When Adams did not stop, Vo tried to physically intervene and retrieve the victim's property, but he only managed to grab the victim's ATM card and electronic cigarette.

Around then, someone said the police had arrived and everyone ran. Vo ran after the victim to see if he was okay and to return his belongings. Unable to locate the victim in the park, Vo searched the street for him. Vo came upon Officer Ta who directed Vo to approach. Officer Ta then handcuffed him, placed him into the back of a patrol car, and later searched him. Vo claimed the money in his pocket was his.

4

B

*Cross-Examination*

As part of a wide-ranging cross-examination, the prosecutor asked Vo about his failure to inform Officer Ta of his exculpatory explanation. The prosecution first asked Vo why he did not seek help from the police after they arrived:

> "[PROSECUTOR]: At some point, you heard the police shout, correct?
>
> "[VO]: Yes.
>
> "[PROSECUTOR]: Now, it's your testimony that you were trying to help [the victim], right?
>
> "[VO]: Yes, sir. [¶] . . . [¶]
>
> "[PROSECUTOR]: When you heard the police and you saw him get beat up and you saw how disfigured he was, you didn't run back up the stairs and tell the police, 'Hey, something is going on down there. You got to help this guy. He is messed up. He looks messed up.' Did you?
>
> "[VO]: Sir, when all that was happening, somebody said 'police.' They ran. I followed him and tried to help him and see if he was okay.
>
> "[PROSECUTOR]: But, sir, when you were talking about trying to help someone, don't you go to the first person that you would seek help? Wouldn't that be the police?
>
> "[VO]: I was intoxicated at the time, sir. My mind was really cloudy. I did not know what to do, and my first thought was to follow him and see if he was okay and return his belongings."

The prosecutor then asked Vo why he did not encourage the victim to seek help from the police:

"[PROSECUTOR]: When you heard the word 'police,' you took off running, and it's your testimony that you ran after [the victim], correct?

"[VO]: Yes.

"[PROSECUTOR]: Did you ever shout out, ' … wait. The police are up there. Let's go find them'?

"[VO]: [The victim] was ahead of me. I just yelled his name, and he did not stop or turn back. He kept on running."

The prosecutor next asked why Vo did not seek help for the victim when he first encountered Officer Ta:

"[PROSECUTOR]: Now, you are walking back, and you see Officer Ta, right?

"[VO]: Yes.

"[PROSECUTOR]: When you see Officer Ta, you comply with what he tells you to do, correct?

"[VO]:  Yes, sir.

"[PROSECUTOR]:  At this point, you never tell Officer Ta, 'Hey. There is a guy hurt. He is somewhere around here. We should find him,' right?

"[VO]: I did not know what to say at that time.

"[PROSECUTOR]: There is stuff inside your pocket that belonged to [the victim]. You didn't reach into your pocket, pull that out, and go, 'This belongs to him. This belongs to him. We should try to find him to return this'? Did you ever tell that to [Officer] Ta --
"[VO]: No, sir.  [¶] . . . [¶]

"[PROSECUTOR]: At no point did you ever tell Officer Ta that, in fact, there was someone hurt, and 'we should be looking for him. … I have his items right here in my pocket,' right?  [¶] . . . [¶]

"[VO]: No, I did not say that.

6

"[PROSECUTOR]: When you see the police, wouldn't that be a logical person to ask for help if, in fact, you are trying to help him?

"[VO]: I told you I was intoxicated at the time. In my mind, I first thought to follow him to see if he was okay.

"[PROSECUTOR]: But now you are not following him anymore. You are detained by the police officer. And at this point, wouldn't this be a good time to tell the officer, 'Hey, officer. Obviously, I can't follow him anymore. I'm being detained by you. We should look for this guy. You should look for him. There is someone hurt in this neighborhood'?

"[VO]: I got scared and that moment and did not know how to handle that situation."

Finally, the prosecutor asked why Vo did not say anything to Officer Ta when

Officer Ta returned to his patrol car where Vo was waiting:

"[PROSECUTOR]: When Officer Ta comes back, after you had this opportunity to contemplate and think about what just happened, is it at this point that you tell Officer Ta, 'Hey, did you find the guy that was hurt in the robbery?' Did you tell Officer Ta that?

"[VO]: I did not know how to approach him with that situation, sir.

"[PROSECUTOR]: At this point, did you tell Officer Ta, 'Hey, Officer. The items that you found inside my pocket, those belong to [the victim]. He is hurt. He's in this neighborhood. You should find him'? Did you tell him that?

"[VO]: No, sir.

"[PROSECUTOR]: In fact, isn't it true when Officer Ta tried to speak to you to get your side of the story, you actually refused to talk to him?

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Sustained. Next question.

7

"[PROSECUTOR]: Did you ever tell Officer Ta your side of the story?

"[VO]: No, sir."

C

<em>Redirect</em>

On redirect, Vo clarified:

"[DEFENSE COUNSEL]: After you were contacted by Officer Ta, did he immediately handcuff you?

"[VO]: Yes, sir.

"[DEFENSE COUNSEL]: Did he immediately place you in the back of a police car?

"[VO]: Yes, sir. [¶] . . . [¶]

"[DEFENSE COUNSEL]: Did he ever give you the opportunity to even discuss the matter?

"[VO]: He asked me if I knew [the victim], and I said I did not know him.

"[DEFENSE COUNSEL]: And that's when you were in the back of a police car?

"[VO]: Yes. [¶] . . . [¶]

"[DEFENSE COUNSEL]: What else happened?

"[VO]: That's it. And then he asked if I would like to speak with him, and I said I would not.

"[DEFENSE COUNSEL]: Exercising you right -- [¶] . . . [¶] -- that you don't have to talk to an officer -- [¶] . . . [¶] -- after you are handcuffed and arrested?

"[Vo]: Yes."

8

## D

### *Recross-Examination*

The prosecutor further probed Vo about his silence during recross-examination:

"[PROSECUTOR]: When they are taking you to jail … [¶] . . . [¶] … did you ever tell them, 'Hey, you've got to help a person I just met, and I've got some of his stuff'?  Did you tell them that?  [¶] . . . [¶]

"[VO]: [Officer Ta] took the things out of my pocket, sir.

"[PROSECUTOR]: I know, but you can still talk, right?

"[VO]: I did not speak with Officer Ta, sir.

"[PROSECUTOR]: Did you speak with the officer that was transporting you to jail?

"[VO]: No, sir.  [¶] . . . [¶]

"[PROSECUTION]: And when they told you that … you were being arrested and being charged with a crime, did you ever tell them, 'No, I didn't.  I was trying to help him out.  I was trying to help him out'?

"[DEFENSE COUNSEL]: Your honor, I think any questioning that the counsel is doing now is totally inappropriate."

The court took up the matter in an unreported sidebar.  The court then directed the prosecutor to proceed to the next question without explicitly ruling on the objection.  The prosecutor continued:

"[PROSECUTOR]: When Officer Ta searched through your pockets and found the items, the card, the cigarettes, and the money, did he show them to you?

"[VO]: He took it out of my pockets and put them on the back trunk, and then he came to the car and showed me the card and the smoking pipe.  [¶] . . . [¶]

9

"[PROSECUTOR]: At this point, when he showed you those items, did you tell Officer Ta that, 'Those belong to someone else. They don't belong to me'?

"[VO]: I never spoke with him, sir.

"[PROSECUTOR]: At that point, did you tell him that [the victim] is hurt and running around … ?

"[VO]: I never spoke with him, sir.

"[PROSECUTOR]: In fact, you never said anything to Officer Ta to help [the victim] at that point, correct?

"[VO]: I was in handcuffs. I didn't know if he was going to help, sir. I did not say anything.

"[PROSECUTOR]: You didn't know if he was going to help?

"[VO]: I didn't know how to say it to him, sir, say, 'Oh, I just have his property in my pocket.'

"[PROSECUTOR]: Could you have just said, 'Help. There is a person hurt'?

"[VO]: I'm not sure, sir. I told you I was drunk at the time."

The prosecutor did not ask Vo any further questions, and defense counsel immediately rested his case.

E

*Record of Sidebar*

The next day, prior to closing arguments, the court allowed the prosecutor to make a record of the sidebar conversation with the court. According to the prosecutor, the court found defense counsel's objection to the prosecutor's question about Vo's silence was not an appropriate or legal objection. The court also found defense counsel had

10

opened the door to the question by asking Vo on redirect about whether he was exercising his right of silence. Defense counsel did not dispute the prosecutor's account of the sidebar conversation, but pointed out it was the detective who investigated the incident who first mentioned Vo had "invoked." The prosecutor in turn pointed out the detective was responding to a question by defense counsel at the time.

## DISCUSSION

Vo contends the trial court prejudicially violated the *Doyle* decision by allowing the prosecutor to impeach him with questions about his failure to speak with police officers after he had been waiting in the patrol car and while he was being transported to jail. The People raise three points in response: (1) Vo forfeited this issue by failing to object on this basis below; (2) Vo has not established the *Doyle* decision applies because the record is silent on whether he received the advisements required by *Miranda v. Arizona* (1966) 384 U.S. 436, 478-479 (*Miranda*); and (3) any error was harmless beyond a reasonable doubt. We need not address the first or second point as we agree with the third.

"The Fifth Amendment's self-incrimination clause states that '[n]o person … shall be compelled in any criminal case to be a witness against himself  . . . .'  (U.S. Const., 5th Amend.)" (*People v. Tom* (2014) 59 Cal.4th 1210, 1222-1223 (*Tom*).) To effectuate this clause, an individual in custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an

11

attorney one will be appointed for him prior to any questioning if he so desires."

(*Miranda*, *supra*, 384 U.S. at p. 479.)

As a corollary rule, where a defendant receives *Miranda* advisements and properly invokes the right of silence, the prosecution may not use the defendant's silence to impeach the defendant's testimony at trial. (*Doyle*, *supra*, 426 U.S. at pp. 618-619 & fn. 10.) This is because the prophylactic *Miranda* advisements implicitly assure "silence will carry no penalty," and "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle*, at pp. 617–618.)

Conversely, the prosecution may impeach a defendant's testimony with silence exercised in the absence of *Miranda* advisements. (*Fletcher v. Weir* (1982) 455 U.S. 603, 606 (*Fletcher*).) Such silence is not induced by implicit assurances it will not be used against an individual at trial. (*Id.* at pp. 606–607.) Therefore, its use for impeachment does not violate due process. (*Ibid.*)

In this case, the record does not indicate whether or when Vo received *Miranda* advisements. Nonetheless, he testified without contradiction he was exercising his right of silence when he declined to speak with Officer Ta. Assuming, without deciding, the *Doyle* decision applies in this circumstance, we conclude any violation of the decision was harmless beyond a reasonable doubt. (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 629-630 [noting the *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) harmless beyond a reasonable doubt standard applies to *Doyle* error]; *People v. Thomas* (2012) 54 Cal.4th 908, 936-937.)

12

An error is harmless beyond a reasonable doubt if the People establish beyond a reasonable doubt the error did not contribute to the verdict. (*Chapman*, *supra*, 386 U.S. at p. 24.) The People have satisfied their burden here.

First, Vo does not challenge the prosecutor's questions regarding his failure to call out for help from the police when he first learned of their presence, his failure to encourage the victim to seek help from the police, or his failure to seek help for the victim when he first encountered Officer Ta. Vo's responses to these questions impeached Vo's credibility to the same extent or more than his responses to the questions about his silence after he waited in the patrol car or while he was transported to jail. Indeed, the prosecutor emphasized the former silence and did not discuss the latter silence in the prosecutor's closing arguments to the jury.

Second, the questions about Vo's silence were not the only means of impeachment the prosecutor used. He questioned Vo extensively about the internal inconsistencies in Vo's version of events. He also solicited Vo's admission to having two prior felony theft convictions.

Third, there was substantial evidence of Vo's guilt. He matched the description of the men Officer Ta saw fleeing the scene, he was sweating and his T-shirt was covered with plant debris when he approached Officer Ta, he had some of the victim's property in his front right pants pocket, and the victim identified him as one of the assailants shortly after the incident.

Finally, before reaching its verdict, the jury requested a reading of the victim's testimony regarding the identity of the main aggressors. This shows the jury did not rush

13

to judgment and cursorily dismiss Vo's exculpatory testimony because of the questions about Vo's silence after waiting in the patrol car and while being transported to jail. Accordingly, we conclude the record does not show any prejudice resulted from these questions.

## DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

O'ROURKE, J.