Filed 3/14/16  P. v. Lopez CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B261637 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA427831) |
| v. | |
| FRANCISCO LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Affirmed.

Alan E. Spears, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Michael C. Keller and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Francisco Lopez appeals from his judgment of conviction of one count of making criminal threats (Pen. Code,[1] § 422). On appeal, Lopez contends that the trial court abused its discretion in admitting evidence of two civil restraining orders that the victim obtained against him. Lopez also claims that the prosecutor committed prejudicial misconduct and violated his constitutional right to remain silent by referring to Lopez's silence at the time of his arrest as showing consciousness of guilt. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Charges

The Los Angeles County District Attorney charged Lopez with four counts of criminal threats (§ 422) arising from events on March 20, 2014, and one count of attempted criminal threats (§§ 664, 422) arising from events on March 14, 2014. It was alleged that Lopez personally used a deadly or dangerous weapon during the commission of the March 20, 2014 offenses (§ 12022, subd. (b)(1)). It also was alleged that Lopez had one prior serious or violent felony conviction (§§ 667, subds. (a)(1), (d), 1170,12, subd. (b)) and had served three prior prison terms (§ 667.5, subd. (b)). Lopez pled not guilty to each count and denied the enhancement allegations.

### II. The Evidence At Trial

Elidia Q., her husband, Jimmy, and their four children—Elizabeth (age nine), Jonathan (age eight), David (age six), and Jason (age 17 months)—lived across the street from Lopez in Los Angeles. Lopez resided with his mother and Elidia's father, who were in a long-term relationship. Elidia would see Lopez around the neighborhood, but she did not speak to him.

On March 14, 2014, at approximately 7:00 a.m., Jonathan and David were sitting on a bench in front of their house as they waited for Elidia to take them to school. They were laughing and playing a game with another child from the neighborhood. Elidia,

---

[1] Unless otherwise stated, all further statutory references are to the Penal Code.

2

who was inside the house, suddenly heard someone scream, "Fuck you, shut up." Elidia and her brother-in-law went outside to investigate, and Elidia saw that Lopez was screaming at the children from across the street. He appeared angry and told the children multiple times to "shut up" or he would "fuck them up." He continued screaming at the children as he walked across the street toward Elidia's house. As Lopez approached the front gate, he specifically said to then five-year-old David, "Fuck you, faggot. Fat boy. I'm going to fuck you up and teach you respect."

Elidia's husband, Jimmy, arrived home from work as Lopez was walking toward the house. Lopez tried to provoke Jimmy into a physical fight, telling him, "Fuck you. Right now, let's get it on, right now." Lopez also said, "Come on, I want to fuck you up." He grabbed the bars of the front gate and began shaking them. Jimmy told Lopez to calm down and go back to his house. Elidia was afraid and believed that Lopez wanted to hurt someone in her family. She told the children to go inside the house and she then called the police. After the police arrived, they advised Elidia to seek a restraining order. On March 17, 2014, Elidia obtained a temporary restraining order against Lopez. She was informed that the order would be served on Lopez within two to three days. Elidia decided to seek a restraining order at that time because she was afraid that Lopez would hurt her or her children.

On March 20, 2014, at approximately 6:00 p.m., Elidia pulled into the driveway of her house after picking her children up from school. As the children were getting out of the car, Elidia heard Lopez screaming, "I'm going to fuck you guys up and teach you respect." Elidia immediately dialed 911 because she believed the temporary restraining order was in effect. As Elidia was calling the police, Lopez started walking across the street toward her house. He continued to scream that he was going to "fuck [them] up." Elidia was afraid and told the children to go inside the house. She then turned around and saw that Lopez had something in his hand that looked like a knife. Elidia also heard Jonathan say, "Oh, my god, he's got a knife."

Elidia rushed the children inside the house and locked the doors. She instructed them to stay in their bedroom while she spoke to the 911 operator. During the 911 call,

3

Elidia reported that Lopez had a knife and that he told her that he was "going to fuck up [her] kids and teach them respect." Once the police arrived, the children came out of their room and appeared to be scared. Elidia reassured them that everything was okay, but she felt afraid for her life and her children's lives.

Los Angeles Police Officer William Gatlin and his partner responded to Elidia's 911 call. They first met with Elidia and then went to Lopez's house. When Lopez came outside, the officers took him into custody. Lopez appeared "a little upset," but did not say anything. A saw with a seven-inch blade was recovered from Lopez's house. When Officer Gatlin showed the saw to Elidia, she indicated it could possibly be the weapon that Lopez was holding, but she was not sure. After the police left, Elidia's children continued to appear frightened, and David and Elizabeth later began having nightmares. On April 7, 2014, Elidia obtained a permanent restraining order against Lopez. A certified copy of a "civil harassment and restraining order after hearing" dated April 7, 2014 was admitted into evidence at trial.

### III.    Verdict and Sentencing

On the counts arising from the March 20, 2014 incident, the jury found Lopez guilty of criminal threats against Elidia [count 1], but not guilty of criminal threats against Elizabeth, Jonathan, and David [count 2-4]. On the count arising from the March 14, 2014 incident, the jury found Lopez not guilty of attempted criminal threats against David [count 5]. The jury also found the personal use of a weapon allegation in count 1 to be not true. Lopez admitted the prior serious or violent felony conviction and the trial court struck the prior prison term allegations. The court sentenced Lopez to a total term of seven years and eight months in state prison. Lopez filed a timely notice of appeal.

### DISCUSSION

### I.    Admission of Evidence of Civil Restraining Orders

Lopez argues that the trial court abused its discretion in admitting evidence of the two civil restraining orders that Elidia obtained against him. Lopez specifically contends that the fact that a civil court granted Elidia's requests for the restraining orders was not

4

relevant to the reasonableness of her alleged fear. Lopez also claims that admission of the evidence was unduly prejudicial because it suggested to the jury that a court of law already had determined that Lopez was guilty of making criminal threats.

## A. Relevant Background

Prior to trial, Lopez objected to the admission of evidence regarding the two civil restraining orders that Elidia had obtained. His counsel asserted that the evidence was not relevant to the charged crimes because there was no allegation that Lopez violated any restraining order in making the criminal threats. His counsel also argued that the evidence should be excluded as unduly prejudicial because the standard for a civil restraining order was lower than the standard for a criminal prosecution.

The prosecutor contended that the evidence was relevant on the element of sustained fear because it demonstrated that Elidia's fear caused her to take immediate action after the March 14, 2014 incident by seeking a temporary restraining order, and then to complete the process after the March 20, 2014 incident by obtaining a permanent restraining order. The prosecutor reasoned that the evidence thus showed an extended period of sustained fear starting on March 14, 2014, and continuing to the issuance of a permanent restraining order on April 7, 2014.

The trial court found that the evidence of the civil restraining orders was relevant on the issue of Elidia's sustained fear and the reasonableness of that fear. The court also found that the evidence was probative of Elidia's credibility as a witness and that it was not unduly prejudicial under Evidence Code section 352.

## B. Relevant Law

The rules pertaining to the admissibility of evidence are well-established. "Only relevant evidence is admissible at trial. [Citation.] Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant

5

evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) Evidence is unduly prejudicial under Evidence Code section 352 if it "'"'uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues."'"'" (*People v. Carter* (2005) 36 Cal.4th 1114, 1168.) "'[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question. . . .' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) "We will not reverse a court's ruling on such matters unless it is shown '"the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*People v. Merriman*, *supra*, at p. 74.)

To prove a criminal threats offense under section 422, the prosecution must establish that "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

With respect to the requirement that the victim "'reasonably . . . be in sustained fear' for his or her own safety or the safety of his or her family,'" the term "'sustained' has been defined to mean 'a period of time that extends beyond what is momentary, fleeting, or transitory. …' [Citation]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 808.) Accordingly, "[a] violation of section 422 is not complete upon the issuance of a

6

threat; it depends on the recipient of the threat suffering 'sustained fear' as a result of the communication." (*People v. Wilson* (2015) 234 Cal.App.4th 193, 201.) In addition, "'the phrase to 'cause[] that person reasonably to be in sustained fear for his or her own safety' has a subjective and an objective component. A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances." (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140.) "'The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear. [Citation.]' [Citation.]" (*People v. Wilson*, *supra*, 186 Cal.App.4th at p. 808.)

### C. The Trial Court Did Not Err In Admitting the Challenged Evidence

The trial court did not abuse its discretion in admitting the evidence regarding the civil restraining orders. Elidia testified that she obtained a temporary restraining order against Lopez on March 17, 2014, three days after the first incident of threats, because she was afraid that Lopez would hurt her or her children. Elidia further testified that, following the second incident of threats on March 20, 2014, she "completed" the process by obtaining a permanent restraining order against Lopez on April 7, 2014. The fact that Elidia took concrete steps to secure first a temporary and then a permanent restraining order was relevant to showing that she was in a state of sustained fear following each incident. It supported the prosecution's theory that Elidia's fear "'extend[ed] beyond what is momentary, fleeting, or transitory'" by persisting for several weeks after Lopez made each threat. (*People v. Wilson*, *supra*, 186 Cal.App.4th at p. 808.) The evidence also was relevant to showing that Elidia's fear during the March 20, 2014 incident was reasonable under the circumstances. The fact that Elidia had obtained a temporary restraining order three days earlier could support a finding that she reasonably believed Lopez had been served with the order, was angry about it, and intended to harm Elidia and her children when he threatened "to fuck you guys up and teach you respect."

The trial court also acted well within its discretion in concluding that the evidence was not unduly prejudicial under Evidence Code section 352. The testimony about the restraining orders was narrow in scope, did not consume an undue amount of time, and

7

was not uniquely likely to evoke an emotional bias against Lopez. Elidia simply testified about the dates on which she obtained each restraining order, and explained in a single sentence that her motive for doing so was because she "was afraid that [Lopez] was trying to hurt my kids or myself." Despite the limited scope of the evidence, Lopez asserts that the jury may have been confused about the differences between criminal and civil standards of proof, and may have assumed that Lopez had already been found "guilty" of making criminal threats by the civil court. However, the jury was properly instructed that the prosecution had the burden of proving each element of the charged crimes beyond a reasonable doubt, and "'[w]e presume the jury understood and followed the instruction.'" (*People v. Capistrano* (2014) 59 Cal.4th 830, 880.)

Lopez also argues that the evidence of the restraining orders must have prejudiced the jury against him because he was acquitted of criminal threats arising out of the earlier March 14, 2014 incident, and the only difference between the two incidents was that a restraining order was in effect when the second one occurred. This argument lacks merit. The jury found Lopez not guilty on four of the five counts, including the counts alleging that he made criminal threats against Elidia's children during the March 20, 2014 incident. A reasonable inference that can be drawn from the verdicts was that the jury did not believe that Lopez's words caused the children to be afraid for their own safety or the safety of their family, but did believe that Elidia experienced such a state of sustained fear. This is consistent with the testimony at trial. While Elizabeth and Jonathan testified that they were afraid of Lopez, they could not recall the details of the incidents other than that Lopez argued with their father and used "bad words," and they did not appear to understand Lopez's words to mean that he was going to hurt them or members of their family. Elidia, on the other hand, testified in detail about Lopez's specific statements and their effect on her, and explained that she perceived his words as a threat to physically harm her and her children. The fact that the jury found Lopez not guilty on four of the five counts greatly undercuts his claim of undue prejudice. On this record, the trial court did not err in admitting the evidence of the civil restraining orders.

8

## II.     Prosecutor's Comments About Lopez's Silence At the Time of His Arrest

Lopez next asserts that the prosecutor committed prejudicial misconduct and violated his Fifth Amendment privilege against self-incrimination by referring to his silence at the time of his arrest as reflecting consciousness of guilt.

### A.     Relevant Background

During the trial, the prosecutor engaged in the following exchange with Officer Gatlin, one of the officers who arrested Lopez on March 20, 2014:

[Prosecutor:]  And what happened next?  What did you do next?

[Officer Gatlin:]  . . . [Elidia] advised us that [Lopez] had went back in his house across the street.  So we went over there, door-knocked, and the defendant stepped out, and we took him into custody.

[Prosecutor:]  And that's the location of 1331 East 33rd Street, City of Los Angeles, Count of Los Angeles?

[Officer Gatlin:]  Yes.

[Prosecutor:]  And when you made contact with him, what was his demeanor?

[Officer Gatlin:]  You could tell he was a little upset, but he wasn't saying much.

[Prosecutor:]  Did he say anything at all?

[Officer Gatlin:]  No.

[Prosecutor:]  Did you ask him anything prior to your arresting him?

[Officer Gatlin:]  No.[2]

During closing argument, the prosecutor commented on Lopez's silence at the time of his arrest as evidence of his guilt.  In particular, the prosecutor stated:  "Officer Gatlin.  No motive to lie.  He says that the moment he knocks on his door, the defendant comes out.  The defendant doesn't say  anything.  The only thing that Officer Gatlin noticed was the defendant was upset, consistent with someone who had probably just threatened some people.  The defendant doesn't say anything before he gets arrested.  He

---

**2**     Lopez does not argue that the admission of this testimony was error.

9

does not say one thing at all. An innocent person would have said, 'What are you doing here? What are you talking about? Why are you arresting me?' And he did not. . . ." Following an objection by defense counsel, which the trial court overruled, the prosecutor continued: "Ladies and gentlemen, that . . . shows a consciousness of guilt. That's the moment where you say 'Whoa. You've got the wrong person. I don't know what you're talking about. I did not do anything. This is not right.' He did not do that. Innocent people do that. . . . That, ladies and gentlemen, is consciousness of guilt of what he did on March 20, 2014."

### B. Relevant Law

The Fifth Amendment's self-incrimination clause states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." (U.S. Const., 5th Amend.) "'As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in [*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*)], required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." [Citations.]'" (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 215.) Under *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*), "a prosecutor is prohibited from using a defendant's postarrest silence following *Miranda* warnings to impeach his testimony at trial. [Citation.] The basis of the rule is that 'it is fundamentally unfair, and a deprivation of due process, to promise an arrested person that his silence will not be used against him, and then to breach that promise by using silence to impeach his trial testimony.' [Citation.] . . . *Doyle* also prohibits a prosecutor from using a defendant's silence against him during direct examination of an interrogating officer, before the defendant testifies in his own behalf. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 959.)

In *People v. Tom* (2014) 59 Cal.4th 1210 (*Tom*), the California Supreme Court addressed whether the prosecution's reliance on a defendant's silence following his arrest but before receipt of *Miranda* warnings violates the Fifth Amendment privilege against self-incrimination. The Court held that the prosecution's use of a defendant's postarrest, pre-*Miranda* silence was not barred by the Fifth Amendment in the absence of custodial interrogation or a clear invocation of the privilege. (*Id*. at p. 1215.) In reaching this holding, the Court relied on the United States Supreme Court's decision in *Salinas v. Texas* (2013) 570 U.S. ___, ___ [186 L. Ed. 2d 376, 133 S. Ct. 2174, 2182] (*Salinas*), which held in a plurality opinion that the prosecution's use of a defendant's prearrest, pre-*Miranda* silence did not violate the Fifth Amendment where the defendant did not expressly invoke the privilege against self-incrimination in responding to an officer's question. The Court in *Tom* likewise concluded that "the objective invocation rule applies to [the] defendant's postarrest, pre-*Miranda* silence" (*Tom*, *supra*, at p. 1228), and that in the absence of custodial interrogation, the defendant "needed to make a timely and unambiguous assertion of the privilege in order to benefit from it" (*id*. at p. 1215).

### C. The Prosecutor's Comments About Lopez's Pre-*Miranda* Silence Did Not Constitute Reversible Error

In this case, the prosecutor relied on Lopez's pre-*Miranda* silence at the time of his arrest to show consciousness of guilt.[3] On appeal, Lopez acknowledges that, under the general rule set forth in *Tom* and *Salinas*, the prosecution's reliance on a defendant's pre-*Miranda* silence, whether before or after his arrest, does not violate the Fifth

---

[3] While it is unclear from Officer Gatlin's testimony whether Lopez's silence occurred before, during, and/or immediately after his arrest, there is no indication in the record that either Officer Gatlin or the prosecutor referred to any silence that may have occurred following Lopez's receipt of the *Miranda* warnings. Accordingly, there was no *Doyle* error in this case. (See *People v. Clark*, *supra*, 52 Cal.4th at p. 959 [*Doyle* error occurs when the prosecutor uses "a defendant's postarrest silence following *Miranda* warnings to impeach his testimony at trial"].)

11

Amendment privilege against self-incrimination in the absence of custodial interrogation or an unambiguous invocation of the privilege.  Here, there was no evidence that Lopez expressly invoked the privilege against self-incrimination when the police came to his house, knocked on his door, and then placed him under arrest.  Lopez, however, seeks to distinguish *Tom* and *Salinas* on the ground that the defendants in those cases voluntarily answered some questions posed by the police before they were arrested, whereas Lopez was arrested as soon as he stepped out of his house without being asked any questions.  Lopez asserts that the general rule requiring a defendant to expressly invoke the privilege against self-incrimination should not apply in cases where the police do not ask any questions or elicit any statements prior to placing the defendant under arrest.

We need not decide whether the Fifth Amendment barred the prosecutor's use of Lopez's pre-*Miranda* silence at the time of his arrest as substantive evidence of his guilt.  Even assuming, without deciding, that the prosecutor was precluded from commenting on Lopez's silence, any such error was harmless beyond a reasonable doubt.  (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Thomas* (2012) 54 Cal.4th 908, 937.)  The jury found Lopez guilty on only one of the five charged criminal threats counts.  With respect to the one count on which Lopez was convicted—criminal threats against Elidia arising out of the March 20, 2014 incident—there was compelling evidence of his guilt.  Elidia provided detailed, uncontroverted testimony about the threatening statements that Lopez made on March 20, 2014, and the sustained fear that she experienced as a result of his threats.  The jury also heard the audio recording of the 911 call that Elidia made as the events that day were unfolding, which corroborated her trial testimony that Lopez was screaming that he was "going to fuck you guys up and teach you respect."  The 911 call also provided strong evidence that Elidia was in fear for her own safety and the safety of her family, as she could be heard repeatedly telling her children to "run inside the house" and to "lock everything."  Based on the totality of the record, it appears beyond a reasonable doubt that the prosecutor's references to Lopez's pre-*Miranda* silence at the time of his arrest did not contribute to the jury's verdict.  There was no error requiring reversal.

**DISPOSITION**

The judgment is affirmed.

ZELON, Acting P. J.

We concur:

SEGAL, J.

BLUMENFELD, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.