Filed 11/29/21  M.G. v. Superior Court CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| M.G.,<br><br>    Petitioner,<br><br>  v.<br><br>THE SUPERIOR COURT OF EL DORADO COUNTY,<br><br>    Respondent;<br><br>THE PEOPLE,<br><br>    Real Party in Interest. | C093615<br><br>(Super. Ct. Nos. S21CRF0006,<br>PDL20200007) |

In February 2020, petitioner M.G. was charged in juvenile court with a murder he allegedly committed in 1985, when he was 17 years old.  The district attorney filed a motion to transfer petitioner's case to criminal court pursuant to Welfare and Institutions

1

Code section 707, subdivision (a), and M.G. filed a motion for a prima facie hearing.[1] After a combined contested hearing on the motions, the juvenile court found the People had established a prima facie case to support the murder charge and granted the transfer motion.

M.G. filed a petition for an extraordinary writ in this court challenging the court's ruling. He argues the court erred by applying the wrong standard for the prima facie hearing. Additionally, he contends the court erred in its analysis of three of the criteria for determining whether he should have been transferred to criminal court: (1) the degree of criminal sophistication he exhibited, (2) whether he could be rehabilitated before juvenile jurisdiction expired, and (3) the circumstances and gravity of the offense. (See § 707, subd. (a)(3)(A)(i), (B)(i), (E)(i).) We disagree and will deny his petition for writ of mandate.

## I. BACKGROUND

On July 7, 1985, at about 3:30 a.m., a sheriff's deputy responded to a report of a homicide at a house in El Dorado Hills. The deputy saw blood spatter and smears on the walls and on the doorway adjacent to the upstairs bedroom. The carpet leading to the bedroom had significant bloodstain.[2] The victim was on the bed next to a lamp base with a significant amount of blood on it.

The coroner's report indicated the victim had a battered face, a bite mark on her left rear shoulder, and 29 stab wounds. The stab wounds included four to the head, one to the jugular vein, one to the chest that perforated a rib and injured a lung, seven on her hands and forearms, and five on her back (one of which pierced her lung).

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The juvenile court indicated that while the evidence showed the victim's body was moved, there was no evidence petitioner moved the body.

Steve testified that earlier that evening, he and petitioner were at their friend K.'s house in El Dorado Hills for a party. After the sun went down, Steve, petitioner, and K. walked to a park where they drank beer, smoked marijuana, and met a girl. Eventually, K. walked the girl home, and Steve and petitioner headed back to K.'s house. Steve and petitioner saw the police and ran into a house that was under construction. They hid there, and Steve fell asleep. When Steve awoke, petitioner was gone. Steve returned to K.'s house, where he found K. but not petitioner. Steve fell back asleep. When Steve awoke early in the morning, petitioner had returned and was sleeping with what appeared to be dried blood on his jacket. Later that morning, Steve found petitioner in the backyard, soaking his clothes in a kiddie pool. The water in the kiddie pool was red. When Steve asked petitioner about it, petitioner said he had killed a rabbit as a sacrifice to Cthulhu—a character in H.P. Lovecraft's writings—to gain power. Steve testified this seemed ridiculous.

After Steve and K. saw a newspaper article about the murder, they asked petitioner about it. Initially, petitioner repeatedly denied it, and then finally told them he did it. He seemed excited while describing it. Steve believed petitioner but said "it was completely surreal" because it was out of character for petitioner. Petitioner told Steve he came in and startled the woman. Steve testified that petitioner said the woman fought back, and she would not die even though he kept stabbing her. Steve knew petitioner carried a Buck knife. Petitioner said the tip of his knife had broken off in her skull. Steve said petitioner claimed to have kicked the woman's jaw off. Steve explained that externally their relationship did not change, but internally, "after hearing the account of what he did and what he was capable of," Steve feared "coming forward and maybe being the recipient of a similar attack." Steve felt there "was an uneasy truce. I keep my mouth shut; I get to live." One night, petitioner was drunk and cried to Steve's brother that "he did this."

The girl from the park was the victim's daughter. She testified that she returned home from the park with one of the boys and the two of them sat outside on the curb. Two other people drove up.[3] The boy left, and the girl went inside to find her mother had been killed.

Petitioner was interviewed by an investigator for the El Dorado County Office of the Public Defender in September 2020. Petitioner told the investigator that K., Steve, and he walked the girl home and then returned to the park. Later, petitioner returned to the girl's home to look for his friends. He recalled the victim saying, " '[w]hat the fuck are you doing in my home?' " He then described a struggle between them and the victim hitting him repeatedly with a lamp. He explained that he stabbed her and dropped the knife in the trash a few houses away from the victim's home.

Dr. Soulier, a forensic psychiatrist, testified as an expert witness for petitioner. He conducted three interviews with petitioner. Dr. Soulier described petitioner as "just not a guy who feels a lot about things." He does not believe petitioner is a sociopath because petitioner did not continue to be violent or take advantage of people: "if he was truly that sociopath, it's a pervasive quality. It doesn't go away." Dr. Soulier and petitioner discussed the fact someone else served 15 years in prison for the crime petitioner committed; petitioner said that was " 'a bummer.' " Dr. Soulier opined that while the comment was "striking" and could reflect a lack of empathy for others, lack of empathy was not "more pervasive" and thus the comment could reflect petitioner's generally nonchalant attitude.

Dr. Soulier testified petitioner described what happened that night in July 1985 to him. Petitioner said he was highly intoxicated, staggering, disoriented, and confused, and

---

[3] According to the evidence presented in this proceeding, one of these people was convicted of murdering the victim but subsequently exonerated by the DNA evidence that led the district attorney to focus on petitioner.

4

left the park to go to K.'s house to use the restroom. When he returned to the park, his friends were not there, and "for reasons that he cannot explain," petitioner ended up at the home of the girl from the park and knocked on the door. He heard a voice telling him to come in. Inside, he found the victim. They were surprised to see each other. Petitioner said she put her hands on his chest and there was shoving. He tried to get away and pushed her to the ground, but she grabbed his feet and he fell. A knife he had been carrying fell to the ground and both of them peered at it. The victim hit him in the head with a lamp and then he grabbed the knife. Dr. Soulier testified that, at this point, petitioner's memory "becomes patchy." Petitioner told him both that he did not remember stabbing the victim and that he continued to stab her until she stopped fighting back.

Dr. Soulier also testified regarding the criteria the court was considering in ruling on the transfer motion. He opined that the gravity of the crime warranted transfer to adult court, but the circumstances did not. He opined it was not a sophisticated crime because petitioner did not plan to kill anyone that night, and he did not take particularly sophisticated steps to hide his tracks. Further, Dr. Soulier opined petitioner had rehabilitated himself. As to this conclusion, Dr. Soulier stated petitioner had not led a significant life of crime, he had attached enough to someone to marry them, he was warmly attached to his child, he cared for his parents, and he had worked his entire life. Dr. Soulier described his discussions with petitioner regarding his past drug and alcohol use and indicated petitioner's use of alcohol in particular had risen to the level of addiction. Nonetheless, petitioner said he "had stopped all substance use as late as January of 2020." Dr. Soulier believed petitioner's risk level to reoffend was extremely low based on his age and lack of other violent crimes. Additionally, Dr. Soulier believed petitioner had confessed to the crime and taken responsibility for it.

A deputy probation officer for the El Dorado County Probation Department testified regarding the report she prepared recommending that the case be transferred to

5

adult court based on the totality of the transfer criteria. The probation officer sought to interview petitioner, but his counsel declined the request. She reviewed evidence regarding the murder and Dr. Soulier's report. She requested records from Child Protective Services, and no allegations of neglect or abuse concerning petitioner as a child were found. There was no record of any juvenile proceedings regarding petitioner, but he had five convictions as an adult: two for driving under the influence of alcohol (2001, 2005), one for negligent discharge of a firearm (2000), one for carrying a concealed firearm (1995), and one for possession of an illegal substance (1995). The probation officer opined that the criminal sophistication in this case was on "the higher end." She testified that the fact that 35 years had passed "lends itself to a detached emotionless human being." When asked by opposing counsel what services petitioner needed for rehabilitation, she answered that her review of Dr. Soulier's report indicated no mental health condition but "[p]ossibly counseling and services regarding substance abuse with . . . Narcotics Anonymous and Alcoholics Anonymous participation." She also stated counseling services would be warranted based on the current crime and the loss of his father. Because she did not perform a risk assessment, she did not know what petitioner's criminogenic needs were. At the juvenile court's request, the probation officer mentioned there were a number of services that would be available to petitioner under adult supervision as opposed to under juvenile jurisdiction: "Narcotic Anonymous, and Alcoholic Anonymous groups and sponsorships," "a community corrections center which would assist with advancement in employment and pursuit of a college education, as well as moral recognition therapy and counseling services."

A parole agent with the Division of Juvenile Justice (DJJ) testified regarding the different programs available to youth committed to DJJ. She explained that these programs, including substance abuse programs, were geared toward the developing adolescent brain. DJJ has housed individuals in their 30s, but she was not aware of anyone in their 40s or 50s. The parole agent stated that, even if someone is committed to

DJJ by the court, DJJ still has to assess whether it has adequate services and housing for their needs before actually accepting them.

On December 30, 2020, the juvenile court issued a ruling concluding that the People had established a prima facie case to support the murder charge and granting the transfer motion. As to the transfer motion, the court found the criminal sophistication criterion and the rehabilitation criterion both weigh in favor of transfer, petitioner's lack of juvenile delinquency history and consequent lack of previous attempts at rehabilitation through the juvenile justice system both mitigate against transfer, and "[t]he circumstances and gravity of the offense weigh heavily in favor of transfer to adult criminal court."

On January 8, 2021, a criminal complaint was filed in El Dorado County Superior Court charging petitioner with murder.

On February 26, 2021, petitioner sought review of the juvenile court's December 30, 2020 ruling by filing a petition for writ of mandate in this court.

We requested the People file a preliminary opposition. After reviewing this brief and petitioner's reply thereto, we issued an order to show cause why the relief prayed for in this proceeding should not be granted. The People filed a return.

## II. DISCUSSION

A.    *Prima Facie Case*

Petitioner contends the juvenile court erred by applying the wrong standard for a prima facie hearing. Before engaging in its analysis of whether the prosecution had satisfied its burden of establishing a prima facie case, the court set forth the following standard for its determination: "A prima facie hearing in juvenile court has the same purpose as a preliminary hearing in criminal court, which is to establish whether there is sufficient cause to believe the minor committed the crime charged. [Citation.] 'Sufficient cause' is equated with reasonable or probable cause. [Citation.] Evidence that supports a prosecution need not be sufficient to support a conviction[. Citation.] *All*

7

*that need be shown is some rational ground for assuming the possibility that an offense was committed and that the minor committed it.*" (Italics added.) Petitioner contends the italicized sentence was erroneous because it articulates a standard that is less than the sufficient cause standard. In his reply brief, he suggests this sentence applies only to a Court of Appeal's review of the evidence and not to a magistrate or juvenile court in the first instance. We disagree.

In the context of a preliminary examination in criminal court, our Supreme Court has explained a magistrate's role in determining whether there is sufficient cause as follows: "The term 'sufficient cause' is generally equivalent to 'reasonable and probable cause,' that is, such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused. . . . 'Of course, the probable cause test is not identical with the test which controls a jury . . . . The jury must be convinced to a moral certainty and beyond a reasonable doubt of the existence of the crime charged in the information and of every essential element of that crime. But a magistrate conducting a preliminary examination must be convinced of only such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused. [Citations.] In other words, "Evidence that will justify a prosecution need not be sufficient to support a conviction. . . . An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." ' " (*People v. Uhlemann* (1973) 9 Cal.3d 662, 667; accord *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1027.) The Supreme Court in *Uhlemann* was not reviewing an order but determining its preclusive effects. (*Uhlemann, supra,* at p. 664.) Thus, the juvenile court appears to have correctly stated the law applicable to its prima facie determination.

Moreover, petitioner has made no attempt to demonstrate prejudice by, for instance, explaining how this alleged error may have impacted the court's prima facie

8

determination. We agree with the People that the court's ruling demonstrates that it applied the applicable standard correctly. The court ultimately concluded that "[t]he People have established a prima facie case to support the murder charge. The evidence is sufficient to show that [petitioner] had entertained implied malice. He intentionally went to the victim's house armed with a knife. He made efforts to confound the possibility of identification by disposing of the knife, washing his bloody clothes, and remaining silent about the incident for 35 years (other than his admission to Steve[]). He stabbed the victim 29 times, severing her jugular vein and puncturing both lungs. He kicked her in the face and bit her shoulder. He told Steve[] that the victim would not die, and he appeared excited when discussing the killing. All of this demonstrates [petitioner]'s determination to engage in an activity involving a high probability that death would result. The facts presented show intentional conduct by [petitioner] evidencing extreme indifference to the value of human life." Petitioner has demonstrated no basis to set aside the court's conclusion that there is "sufficient cause to believe that [petitioner] committed the crime charged in the petition." We turn now to petitioner's arguments related to the court's ruling on the transfer motion.

## B.     Transfer Motion

### 1.     Statutory Background

"Under Welfare and Institutions Code section 602 juvenile court jurisdiction is based on age at the time of the *violation* of a criminal law or ordinance. It is therefore possible that a person might commit a murder at age 17, be apprehended 50 years later, and find himself subject to juvenile court jurisdiction at age 67." (*Rucker v. Superior Court* (1977) 75 Cal.App.3d 197, 200.) This is essentially our situation. Petitioner was 17 years old at the time of the alleged offense and 52 years old at the time the juvenile court issued the ruling at issue in this proceeding.

" 'Historically, a child could be tried in criminal court only after a judicial determination, before jeopardy attached, that he or she was unfit to be dealt with under

9

juvenile court law. Since 1975 the procedural requirements for fitness hearings have been established by section 707.' " (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 305.) "Amendments to former sections 602 and 707 in 1999 and 2000, some by initiative, changed this historical rule. Under the changes, in specified circumstances, prosecutors were permitted, and sometimes required, to file charges against a juvenile directly in criminal court, where the juvenile would be treated as an adult." (*Ibid*.)

After 2000, "there was 'a sea change in penology regarding the relative culpability and rehabilitation possibilities for juvenile offenders, as reflected in several judicial opinions.' [Citation.] These changes were based upon developments in scientific research on adolescent brain development confirming that children are different from adults in ways that are critical to identifying age-appropriate sentences. [Citations.] In the same period, the California Legislature enacted numerous reforms reflecting a rethinking of punishment for minors. [Citations.] [¶] Consistent with these changes, in November 2016, the public implemented a series of criminal justice reforms through the passage of Proposition 57. For juvenile defendants, Proposition 57 'largely returned California to the historical rule.' " (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 88-89.) " 'Among other provisions, Proposition 57 amended the Welfare and Institutions Code so as to eliminate direct filing [in criminal court] by prosecutors.' " (*Lara*, *supra*, 4 Cal.5th at p. 305.)

As relevant to these proceedings, when an individual has been charged in the juvenile court with a felony allegedly committed when he or she was 16 or 17 years old, the prosecutor "may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction." (§ 707, subd. (a)(1).) "Upon the motion, the juvenile court shall order the probation officer to submit a report on the behavioral patterns and social history of the minor." (*Ibid*.) "To justify the transfer of a minor from juvenile court to the criminal court system, the prosecution bears the burden of establishing by a

10

preponderance of the evidence the minor is not a suitable candidate for treatment under the juvenile court system." (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 715.)

The juvenile court must consider five criteria in determining whether a case should be transferred to criminal court: (1) "[t]he degree of criminal sophistication exhibited by the minor," (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction," (3) "[t]he minor's previous delinquent history," (4) the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor," and (5) "[t]he circumstances and gravity of the offense" alleged to have been committed by the minor. (§ 707, subd. (a)(3)(A)-(E).) These criteria "are based on the premise that the minor did, in fact, commit the offense." (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 682.) Petitioner challenges the juvenile court's consideration of the first, second, and fifth criteria.

" 'The weight to be given [to] each of these factors is within the court's discretion' [citation], as '[n]othing in section 707 indicates that the . . . court [is] required to give equal weight to each of the five criteria or that it would necessarily be an abuse of discretion to find that one criterion outweighed the other criteria.' " (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 186 (*Kevin P.*).)

"If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes." (§ 707, subd. (a)(3).) The court must "clearly and explicitly 'articulate its evaluative process' by detailing 'how it weighed the evidence' and by 'identify[ing] the specific facts which persuaded the court' to reach its decision." (*C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1029.)

2.     *Standard of Review*

"Appellate review of a juvenile court's ruling on a motion to transfer a minor to criminal court is by a petition for an extraordinary writ." (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 187.) We review the court's ruling for abuse of discretion. (*Ibid.*) "The court's factual findings are reviewed for substantial evidence, and its legal

11

conclusions are reviewed de novo. [Citation.] A decision based on insufficient evidence or the court's ' "erroneous understanding of applicable law" ' is subject to reversal." (*Ibid.*)

### 3. *Criminal Sophistication*

The first criterion the court considers in deciding whether to order transfer to a criminal court is "[t]he degree of criminal sophistication exhibited by the minor." (§ 707, subd. (a)(3)(A)(i).) When evaluating this criterion, "the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or peer pressure on the minor's actions, and the effect of the minor's family and community environment and childhood trauma on the minor's criminal sophistication." (*Id.*, subd. (a)(3)(A)(ii).)

After summarizing the relevant testimony from the probation officer and Dr. Soulier on this criterion, the juvenile court explained that Dr. Soulier's opinion relied on petitioner's account of the evening and explanation of the crime. The court, however, found petitioner's account to be "difficult to believe." The court also explained that petitioner's statements to the defense investigator and to Dr. Soulier conflicted. Additionally, the court stated "Dr. Soulier acknowledged that detection avoidance (such as hiding evidence) would indicate some degree of criminal sophistication."

The court concluded its analysis with the following remarks: "[Petitioner] viciously killed [the victim]. He had the wherewithal to dispose of the knife and wash the blood out of his clothes the next morning, albeit in a kid's pool in view of Steve[]. He fabricated a story of killing a rabbit when asked by [Steve] about the source of the blood, he originally denied being involved in the murder, and he kept the killing a secret for 35 years and went about his life as though it never happened. [Petitioner] was raised by a loving family, according to Dr. Soulier, [petitioner] was taught correct principles.

12

[Petitioner] suffered no childhood or adolescent trauma and had no psychological or behavioral issues. His age, average intelligence, and positive upbringing and social history, as well as his efforts to cover up his involvement in the crime, all weigh in favor of transfer to criminal court because they demonstrate his ability to distinguish between right and wrong and to appreciate the risks and consequences of his criminal behavior, and they demonstrate his awareness of the wrongfulness of his conduct. [Citation.] These facts outweigh other factors reported by Dr. Soulier tending to suggest a minimal criminal sophistication. [¶] The People have met their burden regarding the criminal-sophistication criterion, which weighs in favor of transfer to adult criminal court." (Fns. omitted.)

Petitioner argues the criminal sophistication criterion requires that he acted in furtherance of a criminal plan, and that instead of identifying a plan, the superior court arbitrarily connected separate events. We disagree with the premise of petitioner's arguments. Planning can demonstrate criminal sophistication, but neither section 707 nor any case law cited by petitioner render a plan a predicate for a finding of criminal sophistication. (See *Jones*, *supra*, 18 Cal.4th at p. 684 ["their planning and execution of the robbery involved a degree of criminal sophistication precluding a finding of fitness"].) Furthermore, the court's factual findings on the criminal sophistication criterion were supported by substantial evidence. (See *Kevin P.*, *supra*, 57 Cal.App.5th at p. 195 ["Kevin's attempts to cover up the crime constitute substantial evidence of criminal sophistication even if they were 'hopelessly unsuccessful' "].)

Petitioner suggests it was error for the court to consider his 35 years of secrecy and the fact he went on with his life as though nothing happened because the court must consider only criminal sophistication at the time the alleged offense was committed. Assuming without deciding that the criterion is so limited, we nonetheless discern no error. The criminal sophistication criterion "requires a juvenile court . . . to consider the whole picture, that is, all the evidence that might bear on the minor's criminal

13

sophistication, including any criminal sophistication manifested in the present crime."
(*Jones*, *supra*, 18 Cal.4th at pp. 683-684.)  The court's analysis was focused on petitioner's criminal sophistication at the time of the alleged murder.  But in conducting this analysis, the superior court was not barred from considering that petitioner evaded law enforcement for 35 years.  Nor does considering this fact implicate petitioner's right against self-incrimination.[4]  Petitioner essentially asks us to reweigh the facts, suggesting that putting a knife in a trashcan was impulsive, and arguing that falling asleep with a bloody jacket on, washing it while his friends were awake, telling an incredible story about a rabbit, and admitting the killing twice to Steve cannot be substantial evidence of sophistication.  But, as the juvenile court noted, petitioner's efforts were effective in evading law enforcement for decades.  This fact has at least some bearing on the question of his criminal sophistication.  Petitioner may have disposed of the knife in a trashcan that was near the crime scene, but it was never found.  It is relevant to understanding

---

[4]  "The Fifth Amendment's self-incrimination clause states that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' (U.S. Const., 5th Amend.)  The clause does not, however, 'establish an unqualified "right to remain silent." ' [Citation.]  'By definition, "a necessary element of compulsory self-incrimination is some kind of compulsion." ' [Citation.]  The 'sole' form of compulsion targeted by the Fifth Amendment privilege is 'governmental coercion'—not ' "moral and psychological pressures . . . emanating from sources other than official coercion" ' or the absence of ' "free choice" in any broader sense of the word.' [Citation.]  [¶]  The high court has found governmental coercion where, for example, the prosecutor invites the jury to draw adverse inferences from a defendant's failure to take the witness stand. (*Griffin v. California* (1965) 380 U.S. 609 (*Griffin*).)" (*People v. Tom* (2014) 59 Cal.4th 1210, 1222-1223.)  In his reply, petitioner suggests the juvenile court's analysis is analogous to *Griffin* error.  We disagree.  "Although *Griffin* included a general statement that the Fifth Amendment 'forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt' [citation], the court has since clarified that the 'broad dicta in *Griffin* . . . must be taken in the light of the facts of that case'—a prosecutor's comment on a defendant's right not to testify *at trial*." (*Tom*, *supra*, at p. 1223.)  Petitioner has failed to demonstrate the juvenile court's ruling violated his right against self-incrimination.

14

petitioner's criminal sophistication that his subsequent actions supported the notion that he committed murder and, if not for advancements in technology, his efforts were enough to evade punishment and allowed another man to go to prison in his place. The court did not err in considering this fact as part of its analysis.

Petitioner further argues his positive upbringing was not substantial evidence of criminal sophistication. He relies on *Kevin P.*, which explained that "positive factors do not affirmatively demonstrate criminal sophistication. Positive background factors may support a juvenile court's finding that this criterion weighs in favor of transfer to the extent they fail to mitigate other evidence that does affirmatively demonstrate criminal sophistication." (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 193.) As in *Kevin P.*, the juvenile court relied on petitioner's attempts to avoid detection as well as his positive characteristics in concluding that his criminal sophistication weighed in favor of transfer. (*Id.* at pp. 193-194.) As such, there was no error. Petitioner has failed to establish any error with respect to the court's weighing of the criminal sophistication criterion.

4. *Whether the Minor Can Be Rehabilitated Prior to the Expiration of the Juvenile Court's Jurisdiction*

The second criterion the juvenile court considers is "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (§ 707, subd. (a)(3)(B)(i).) When evaluating this criterion, "the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature." (*Id.*, subd. (a)(3)(B)(ii).) "Expert witnesses may testify on the issue of the availability of treatment programs in the juvenile court system and the amenability of the minor to those programs." (*J.N. v. Superior Court*, *supra*, 23 Cal.App.5th at p. 721; see also *Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709, 714-715 ["Since the dispositive question is the minor's amenability to treatment through the facilities available to the juvenile court, testimony of experts that the minor can be treated by those facilities is entitled to great weight in the courts ultimate determination"].) As a general matter, "[a] juvenile court

15

can retain jurisdiction over a minor committed to DJJ for the offense of murder until the minor reaches age 25." (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 198.) Additionally, as the juvenile court noted, it is authorized to commit a person over the age of 25 who committed murder while a juvenile to DJJ for up to two years. (§§ 607, subd. (g); 1769, subd. (b).)

The court began its analysis of the rehabilitation criterion by explaining that DJJ does not automatically take all youth committed and summarizing the parole agent's testimony. Additionally, the court summarized the probation officer's testimony regarding the rehabilitation criterion including her testimony that "there are no services that the DJJ can offer to [petitioner] and DJJ has no services that would be provided to [petitioner] or that would benefit [petitioner] at his age. On the other hand, if [petitioner] was sent to adult prison, she believed he would have access to a number of services that could benefit him, including, without limitation, narcotics anonymous and alcoholics anonymous groups and sponsorship, adult educational programs, employment advancement programs, moral recognitions therapy, and adult counseling services."

The court noted Dr. Soulier's opinion that petitioner had already been rehabilitated. After summarizing Dr. Soulier's testimony regarding the rehabilitation criterion, the court explained, "It is clear to the court that the main hurdle to rehabilitation through the juvenile court system is that DJJ programming is designed for the adolescent brain, and [petitioner] is now 52 years old. DJJ is not structured to meet the needs of a 52-year-old man. [Petitioner] is not 'amenable to the care, treatment and training program available in [juvenile court] facilities.' [Citation.] At age 52, he is simply not an appropriate candidate to be housed at DJJ and to receive adolescent programming and services from DJJ." The court found "it difficult to believe the voters intended Proposition 57, the focus of which is juvenile rehabilitation, to apply to murder charges against mature adults arising from cold case investigations of crimes committed during their youth, mandating they be treated in juvenile court to consider whether they are

16

suitable to be treated like adolescents." On this point we disagree with the juvenile court and agree with petitioner that this statement misunderstands the law. "[I]n enacting an initiative, voters are presumed to be aware of existing laws." (*O.G. v. Superior Court*, *supra*, 11 Cal.5th at p. 98.) And it has long been the law in California that juvenile court jurisdiction is based on the time the offense was committed and not the time the individual was apprehended. (*Rucker v. Superior Court*, *supra*, 75 Cal.App.3d at p. 200.) Further, the stated purposes of Proposition 57 include "[s]av[ing] money by reducing wasteful spending on prisons" and "[s]top[ping] the revolving door of crime by emphasizing rehabilitation, especially for juveniles." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 2, p. 141.) These goals are advanced by avoiding a long prison sentence for a crime committed as a juvenile by anyone who has already been rehabilitated or can be rehabilitated in DJJ. Petitioner's culpability for the murder did not change because he was apprehended decades after his crime. It is still true that at the time of the alleged offense, petitioner was a juvenile. (See *Miller v. Alabama* (2012) 567 U.S. 460, 471-472 [discussing diminished culpability of juveniles].) His possibilities for rehabilitation may have changed with the passage of time, but that was an inquiry the juvenile court was tasked with making in ruling on the transfer motion.[5] We thus turn to the critical question of whether the juvenile court adequately engaged in this inquiry.

We conclude the court's stray statement regarding the electorate's intent did not prevent it from adequately answering the question of whether petitioner could be

---

[5] Petitioner relies on *Lara*, *supra*, 4 Cal.5th 299 and other cases applying Proposition 57 retroactively to a defendant. Proposition 57 took effect before proceedings against petitioner were initiated. (See *Lara*, *supra*, at p. 304 [Proposition 57 took effect November 9, 2016].) It does not apply retroactively to him. The question is not, therefore, whether the court *would have* found petitioner fit for juvenile court treatment if a motion to transfer had been filed earlier. (See *id*. at p. 310.) The question is whether the court finds petitioner fit for juvenile court treatment based on the statutory criteria now.

rehabilitated before the expiration of its jurisdiction. Indeed, the court continued in the alternative: "*In any event*, the evidence presented was inadequate to establish that there is any available or suitable juvenile facility designed to house, care for, and treat youth to which the juvenile court could commit a 52-year-old man that would be suitable for his housing, care and treatment should he be adjudicated for murder. To the contrary, the evidence established that juvenile facilities are designed to house and reprogram adolescents, not mature adults. As testified to by the probation officer, the facilities to which the criminal court may sentence a mature adult are more appropriate to house, care for, and treat the 52-year-old [petitioner] should he be found guilty of murder. [¶] The People have met their burden regarding the rehabilitation factor. This factor weighs in favor of transfer to adult criminal court." (Italics added.)

In this writ proceeding, petitioner continues to argue he was rehabilitated, and he contends the juvenile court erred by disregarding his conduct between his offense and the transfer hearing. Relatedly, he asserts the court failed to consider whether rehabilitation services were needed and whether more time was required. (See *Jimmy H. v. Superior Court*, *supra*, 3 Cal.3d at p. 715 ["If the possibility that the Youth Authority might have to treat a ward of the juvenile court beyond the age of his majority is the determinative factor in the court's decision that the minor is unfit, there must be substantial evidence in the record that successful treatment might require the extra time"].) Petitioner also contends the court erred in applying the rehabilitation criteria by focusing on the facility rather than petitioner's actual needs. We disagree.

The court summarized evidence regarding petitioner's post-offense rehabilitation and implicitly disagreed with Dr. Soulier's opinion that petitioner was already rehabilitated. We can reasonably infer from the court's statement that "the facilities to which the criminal court may sentence a mature adult are more appropriate to . . . *treat* the 52-year-old [petitioner]" that the court found him to require treatment. (Italics added.) Indeed, the court concluded the People met their burden with respect to "the

18

rehabilitation factor." As the court spelled out in a heading, the factor asks "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (§ 707, subd. (a)(3)(B)(i).) We can reasonably infer what the court meant. (Cf. *C.S. v. Superior Court*, *supra*, 29 Cal.App.5th at p. 1024 ["we can reasonably infer from the juvenile court's order that the court found this criterion to weigh in favor of transfer to adult/criminal court"].) In context, it is apparent that the court explained that "the *main* hurdle to rehabilitation through the juvenile court system is that DJJ programming is designed for the adolescent brain" because, without any applicable programming, a detailed discussion of other hurdles such as petitioner's specific rehabilitative needs and the time necessary to address them was unnecessary. (Italics added.) (See *Kevin P.*, *supra*, 57 Cal.App.5th at p. 193 ["in the context of the court's overall discussion we think its reasoning is sufficiently clear"].) The court's conclusions were clear. Moreover, they are supported by the record. As the court noted, even Dr. Soulier reported that petitioner struggled with substance abuse (with a recent period of sobriety) and appeared indifferent and callous about the crime (though Dr. Soulier attributed the latter to compartmentalization of negative memories). The court considered the argument and evidence that petitioner was rehabilitated, and its conclusion that petitioner still required rehabilitation but could not be rehabilitated under its jurisdiction was supported by the evidence and not an abuse of discretion.

This case is distinguishable from *Kevin P.*, *supra*, 57 Cal.App.5th 173. There, the juvenile court erred in treating the parole consideration period of 7 years as establishing a minimum rehabilitation period. (*Id*. at pp. 198-199.) The appellate court further explained that the prosecution had "presented little if any evidence to demonstrate what Kevin's rehabilitative needs were, much less why they could not be met through a DJJ commitment." (*Id*. at p. 200.) These inquiries go together. Here, the juvenile court explained the facility could not provide the services that petitioner required. Under the circumstances, it was unnecessary to make detailed findings about what those missing

19

services were.  And, unlike in *Kevin P.* and *J.N.*, *supra*, 23 Cal.App.5th 706, the prosecution presented substantial evidence that the existing programs were unlikely to meet petitioner's needs.  (See *J.N.*, *supra*, at p. 722 ["the prosecution did not present any expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate J.N. before termination of the juvenile court's jurisdiction"].)  Thus, the court did not need to address how much time petitioner would require for rehabilitation if that rehabilitation could not occur under its jurisdiction.  The court did not abuse its discretion in determining the rehabilitation criterion weighed in favor of transfer.

     5.     *Circumstances and Gravity of the Offense*

The fifth criterion is "[t]he circumstances and gravity of the offense" alleged to have been committed by the minor.  (§ 707, subd. (a)(3)(E)(i).)  "[T]he allegation that a minor committed a serious offense, including murder, does not 'automatically require a finding of unfitness.' [Citations.]  Rather, in evaluating this criterion, a juvenile court may rely on evidence that, 'while not justifying or excusing the crime, tends to lessen its magnitude' [citation], 'including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development.' (§ 707, subd. (a)(3)(E)(ii).)" (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 189.) Petitioner contends the juvenile court's findings regarding the circumstances and gravity of the offense were not supported by substantial evidence.  We disagree.  Again, petitioner seeks a reweighing of the evidence.  He contends the juvenile court did not "conduct a totality of the circumstances analysis" by considering, for instance, that petitioner told Steve that the victim was startled and petitioner did not know what

happened after that,[6] that petitioner was inebriated, and the crime was surprising to the witnesses with knowledge of petitioner. But the court's restatement of Dr. Soulier's testimony makes plain that it considered these arguments. The court simply "disagree[d] with Dr. Soulier's opinion that mitigating circumstances override the gravity of the offense so as to weigh against transfer." Rather, the court concluded that the circumstances and gravity of the offense weighed "heavily" in favor of transfer to adult criminal court. The court explained "[t]his was a grisly crime with no credible evidence of self-defense. [Petitioner] was the only perpetrator" and he "stabbed [the victim] 29 times with an amount of force well beyond what would be reasonably necessary to protect and defend oneself and get to a place of safety. He also took measures to cover up his involvement in the crime, including disposing of the murder weapon, washing his bloody clothes, fabricating a story about why his clothes were bloody, lying about his involvement in the crime, and keeping it a secret for some 35 years. [¶] [Steve] testified that [petitioner] told him . . . that he kicked part of [the victim]'s jaw off. Skin from her jaw was found at the crime scene. [Steve] testified that [petitioner] told him he broke the tip of his knife off on [the victim's] skull and that [the victim] would not die. [Steve] further testified that [petitioner] seemed excited when he finally admitted to killing the victim. [Petitioner] disposed of the knife, found his way back to [K.]'s house, wash[ed] out his bloody clothes, lied about the homicide, and kept quiet about it for 35 years. [Petitioner]'s mental state appears to have been one of excitement and actual knowledge of what he was doing. [¶] By all accounts, [petitioner] was raised by a loving family, suffered no childhood or adolescent trauma, and had no psychological or behavioral issues. There are simply no circumstances of [petitioner]'s upbringing—such as neglect, abuse, or other trauma—that would mitigate the gravity or lessen the magnitude of this

---

[6] Steve testified that he did not "know what the segue is between [petitioner] having startled the woman . . . and the attack."

21

crime." These findings were supported by the evidence we have previously summarized. Again, petitioner contends the court should not have considered anything that occurred after the offense, such as petitioner's efforts to cover up his involvement in the crime and 35 years of silence. We discern no abuse of discretion. These facts were relevant to the circumstances and gravity of the offense. As the juvenile court demonstrated, defendant's actions after he killed supported the juvenile court's conclusion that petitioner understood what had occurred and did not act in self-defense but deliberately committed and concealed a particularly violent murder. Petitioner has not demonstrated any error with respect to what was apparently the primary criterion the court used to find him unsuitable for treatment in the juvenile court system.

Petitioner has not demonstrated the court erred in transferring jurisdiction to the criminal court.

### III. DISPOSITION

The petition for writ of mandate is denied.

/S/

_____

RENNER, J.


We concur:

/S/

_____

DUARTE, Acting P. J.


/S/

_____

KRAUSE, J.

22